1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
BYRON GEOVANNY AREVALO          : 21-CV-5236(PKC)(SJB)
FAJARDO, et al.,                :
                                :
        Plaintiffs,             :
                                : United States Courthouse
                                : Brooklyn, New York
        -against-               :
                                :
                                :
WB MAINTENANCE & DESIGN         : Monday, December 20, 2021
GROUP, INC., et al.             : 10:00 a.m.
                                :
        Defendants.             :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF
CIVIL CAUSE FOR PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs:     LEVIN-EPSTEIN & ASSOCIATES, P.C.
                        Attorneys for the Plaintiffs -
                        Byron Geovanny Arevalo Fajardo
                            60 East 42nd Street
                            Suite 4700
                            New York, New York 10165
                        BY: JASON MIZRAHI, ESQ.

For the Defendants:     KOUTSOUDAKIS & IAKOVOU LAW GROUP, PLLC
                        Attorneys for the Defendants -
                        WB Maintenance & Design Group, Inc.
                            90 Broad Street
                            10th Floor
                            New York, New York 10004
                        BY: STEVEN SIEGLER, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

```
                          Proceedings                      2
```

1                (In open court.)

2                COURTROOM DEPUTY:  All rise.  The United States

3       District Court for the Eastern District of New York is now

4       in session.  The Honorable Pamela K. Chen is now presiding.

5                (Honorable Pamela K. Chen takes the bench.)

6                COURTROOM DEPUTY:  Calling civil cause for

7       preliminary injunction hearing in Docket No. 21-CV-5236,

8       *Byron Geovanny Arevalo Fajardo against WB Maintenance &*

9       *Design Group, Inc.*.

10               Counsel, please note your appearances for the

11      record.

12               MR. MIZRAHI:  For the plaintiff, Byron Geovanny

13      Arevalo Fajardo, Levin-Epstein & Associates, P.C. by Jason

14      Mizrahi.

15               Good morning, Your Honor.

16               MR. SIEGLER:  For the defendant, WB Maintenance &

17      Design Group, Inc., Koutsoudakis & Iakovou Law Group, PLLC

18      by Steven Siegler.

19               Good morning, Your Honor.

20               COURTROOM DEPUTY:  We are here for civil cause for

21      preliminary injunction hearing 21-CV-5236, Arevalo Fajardo

22      WB Maintenance & Design Group.

23               State your appearances for the record starting

24      with plaintiff.

25               MR. MIZRAHI:  Good morning, your Honor, my name is

```
                         Proceedings                      3
```

1  Jason Mizrahi from Levin-Epstein & Associates, P.C., counsel

2  for the plaintiffs.  Joined with me this morning is my

3  client Carlos Martell.

4            THE WITNESS:  My name is Carlos Martell.

5            THE COURT:  Good morning to both of you.

6            THE WITNESS:  Good morning.

7            THE COURT:  For the defense.

8            MR. SIEGLER:  Steven Siegler here today on behalf

9  of the corporate defendants and the individual defendants.

10            THE COURT:  Okay.  Let's do this.  Let's have you

11  moved up to the front of the table so I could see you a

12  little bit.  And then I want to ask everyone to make sure

13  you use the microphones because, especially with the masks,

14  it's quite difficult to hear you.

15            Mr. Martell, there's a closer one.  Let's see if

16  it reaches you.  There you go.  Just make sure you use that

17  although.  I think, ultimately, you're going to end up here

18  in the witness box.

19            So we're here today for a hearing, and perhaps an

20  evidentiary hearing, I think, in connection with the request

21  for a preliminary injunction by the plaintiffs.

22            The way we're going to proceed is I do have a

23  couple of preliminary questions for the parties, but I think

24  the purpose, and the main purpose is for me, to hear today

25  from Mr. Martell or any other witnesses that either side

Proceedings                               4

1   has.

2          Now, Mr. Siegler, you seem to be sit ago lone, so

3   I'm assuming alone that the defendants are not putting any

4   witnesses; is that right?

5          MR. SIEGLER:  We had our witness testify by

6   affidavit.

7          THE COURT:  Okay.  So you're going to rely on your

8   affidavits?

9          MR. SIEGLER:  Yes.  And I would ask that

10  Mr. Martell rely on his affidavit as well.

11         THE COURT:  Well, no, I actually want to hear from

12  someone, if possible.  Obviously, I had the discretion to

13  rely on whatever evidence seemed sufficient or competent.

14  But, certainly, since Mr. Martell is willing to testify and

15  you can cross-examine him.

16         MR. SIEGLER:  Yes.

17         THE COURT:  I'd like to hear from him because my

18  preliminary question to you is going to be that it seems to

19  me that were the basis for your opposition, or your client's

20  opposition to the motion, is a purely factual one.  In other

21  words, defendants are disputing the facts upon which the

22  plaintiffs rely in seeking this preliminary injunction.

23         It seems to me that if I find by a preponderance

24  that the plaintiffs have proved the facts that they alleged

25  which could support a finding of retaliation by the

Proceedings                                              5

1   defendant in connection with this lawsuit that an injunction

2   might be appropriate or actually would be appropriate.

3          So am I correct in terms of characterizing the

4   defendant's opposition as being really a factual one?  You

5   claim that what the plaintiffs allege happened didn't happen

6   or hasn't happened.

7          MR. SIEGLER:  Well, there's two issues.  One is an

8   altercation with Mr. Alex Briceno who is not here today, who

9   I don't represent, who the Court can't issue an injunction

10  against because he hasn't been given due process.  I'm not

11  sure what steps the plaintiff did to secure his appearance

12  today, but I don't represent him.  I never represented him.

13         THE COURT:  Right.

14         MR. SIEGLER:  So that's one issue.  Leaving aside

15  the altercation, which did not involve any of the individual

16  defendants, I think that's a factual issue that involved

17  this non-party, Mr. Briceno.  The issue of the deportation,

18  or the threats of deportation, is certainly a factual issue

19  that your Honor has to determine.  There's been no evidence

20  other than a bald, conclusory statement that it happened.  I

21  would like to hear from Mr. Martell about that, I guess.

22         And I'll say just briefly, your Honor, if he's

23  going to supplement his affidavit, I think that would be

24  highly prejudicial to the defendants because we haven't had

25  time to look at his affidavit, this new testimony.  In other

Proceedings                                        6

1    words, he supplements and adds new facts, my client won't

2    have a chance to respond by affidavit to those new facts.  I

3    would like him to stick to his affidavit, and I can

4    cross-examine on his affidavit, because that's the evidence

5    before your Honor.

6             THE COURT:  All right.  Well, again, let me go

7    back to the question I asked first and then I'll address

8    what you raised.

9             I do understand your argument regarding due

10   process for Alex Briceno who is not yet a party in this

11   matter, although, as you know, and you don't represent Alex

12   Briceno, the plaintiffs are moving to amend Alex Briceno as

13   a defendant based on what they allege happened since the

14   filing of this case.  So I think that the procedural hurdle

15   or legitimate one that you can raise based on the outcome of

16   the amendment.

17            In other words, if Mr. Briceno -- or if I allow

18   plaintiffs to amend or accept their amended complaint,

19   Mr. Briceno will be a defendant and he can reopen the

20   question about a preliminary injunction or perhaps

21   procedurally what I'll do potentially or could do is to

22   allow the amendment first and then we revisit the question

23   about a preliminary injunction at which he can then register

24   any complaint or oppose, or obviously, seek due process with

25   regard to that -- those allegations as to him.

Proceedings                                    7

1      But again, my question is to you is:  Assume for

2  the moment there is this, there is an allegation not only

3  that Alex Briceno assaulted Mr. Martell but that your

4  clients, and you should probably tell me how to pronounce.

5           MR. SIEGLER:  Jeissy.

6           THE COURT:  Jeissy.

7           MR. SIEGLER:  Wladimir is the father, Betty is the

8  mother.  Jeimy is one of the sisters and Jeissy is the

9  sister who witnessed the aftermath of the altercation.

10          THE COURT:  Okay.  So the question is:  Is that if

11 I find that Alex Briceno assaulted Mr. Martell as claimed at

12 the urging of, or in conspiracy with, or coordination with

13 Jeissy Briceno who is one of the defendants, would an

14 injunction be appropriate to prevent any further -- and,

15 again, this is assuming I find that some retaliation has

16 occurred -- to prevent any further retaliation, harassment,

17 or intimidation in connection with this case.  Is this not

18 just a factual dispute as to your client?

19          MR. SIEGLER:  There is only one client of mine

20 that was present that night.  There has been no allegation,

21 no hint of an allegation that the father, the elderly

22 father, was there or did anything; or the elderly mother was

23 there or did anything.  I make that argument, I think it is

24 a legal argument, that the preliminary injunction that's

25 being sought is overbroad.  It's against all of the

Proceedings                                8

1   defendants for every -- and their employees and agents and

2   representatives and possibly their attorneys, right?  Not

3   that I have any interest in harassing Mr. Martell.

4        So if you were to find, for instance, that Jeissy

5   despite her text message which clearly doesn't say, Come

6   down to beat this guy up because of the lawsuit.  It says

7   this guy is here and is freaking me out in so many words.

8   Then, yes, I guess your Honor could enter some kind of an

9   injunction against her personally one of the defendants but

10  not all.

11       THE COURT:  Okay.  Did you want to add anything

12  before I hear from Mr. Martell, Mr. Mizrahi?

13       MR. MIZRAHI:  I think your Honor is aware of the

14  facts at this point and I don't want to take up any more of

15  the Court's time than is needed to just go over the issue.

16       But, your Honor, the circumstances here are dire.

17  Obviously, the granting of a preliminary injunction is not

18  something that is done liberally.  We are here in court

19  physically which speaks volumes, and although that the legal

20  threshold for the granting of a preliminary injunction does

21  require, you know, the Court to really balance the legal

22  fundamental issues, the factual issues here are very simple.

23       There are three factual predicates here that

24  really apply, none of which seem to be really in dispute.

25       Number one, Alexander Briceno has made verbal

1    threats to report certain plaintiffs to the INS.

2          THE COURT:  Hang on a second.  That I don't think

3    you can characterize as undisputed.  I think the problem is

4    there hasn't been any specificity as to who, when, what was

5    said, et cetera.  So I actually do want to hear from

6    plaintiffs about that.  I think it's curious and a bit

7    confounding procedurally.  And on this I agree to some

8    extent with the defense about.  It it's hard to defend

9    against vague allegations or a nonspecific allegations of

10   threatening to go to immigration authorities.  Throughout

11   your briefing, it's never been articulated or specified.

12         MR. MIZRAHI:  For good reason, your Honor.  For

13   good reason.  Number one, the evidentiary threshold that

14   applies to preliminary injunctions is different from the

15   evidentiary threshold that may apply at summary judgment or

16   at trial.  There's case law in our reply memo of law which

17   I'm happy to cite to.

18         THE COURT:  Hang on a second.  I understand the

19   hearsay aspect of it, but you cannot ask for preliminary

20   relief based on some general notion that -- or some general

21   complaint or conclusory complaint that there's been these

22   threats by a non-party.  And then, basically prevent -- or

23   that prevent the defense from defending against them.  How

24   do they defend against nonspecific threats about going to

25   immigration?

Proceedings                              10

1          MR. MIZRAHI:  The due process argument is

2   something that, you know, is -- seems like a lawyer's

3   contrivance without any casting any aspersions.  Alex was

4   aware of this case.  Alex turned himself into the

5   authorities voluntarily after the filing of the preliminary

6   injunction.  Alex --

7          THE COURT:  Wait.  In connection with the assault.

8          MR. MIZRAHI:  In connection with the assault.

9          THE COURT:  He was arrested is what I understood.

10          MR. MIZRAHI:  He was arrested after he had turned

11   himself in voluntarily.  So he was already aware of the

12   circumstances surrounding the preliminary injunction, he was

13   already aware of the circumstances surrounding this case.

14   This is not a due process issue.

15          THE COURT:  Yes.

16          MR. MIZRAHI:  If Alex had wanted to --

17          THE COURT:  Hold on a second.

18          But you're asking that the defendants, who don't

19   right now include Alex Briceno, also be enjoined from making

20   threats of deportation or anything else so let's talk about

21   that.  Why can't you tell me or why should I accept your

22   vague representation that Alex Briceno, on behalf of the

23   other defendants, purportedly has been making threats to

24   report individuals to INS.

25          MR. MIZRAHI:  Your Honor is correct in trying to

Proceedings                                11

1   get as much information surrounding this issue as the Court

2   can.  And as I had previously mentioned, there's good reason

3   why we haven't provided as much specificity as we otherwise

4   would have.

5          Number one, I had previously mentioned that the

6   rules surrounding hearsay are somewhat lenient surrounding a

7   preliminary injunction as though otherwise are for a summary

8   judgment and trial.

9          Number two --

10         THE COURT:  Hang on, I don't accept your

11  explanation because that's a different issue, that's the

12  form or the manner in presentation, I accept that.

13         Mr. Martell, I might, although it affects the

14  weight, give me the information that others have told him,

15  fine.  But the question is:  Why not be specific?  So

16  address what your good reason is for not specifying or

17  giving details about these allege the threats.

18         MR. MIZRAHI:  Given the sensitivity, and given the

19  real threat to these individuals' immigration statuses, we

20  haven't provided their names.  We have them, we can provide

21  them to the Court, we haven't done it so far just because of

22  how sensitive of an issue it is of these people are fearing

23  for their safety.

24         THE COURT:  But, okay.  Let's break that down a

25  bit.

Proceedings                    12

1        I certainly understand why you might not say this

2   person fears the threat because, in fact, they are here

3   illegally or work illegally.  I understand that you don't

4   want to make an admission of that sort.  But that doesn't

5   speak to why or doesn't explain why you haven't said here

6   are the threats that are being made because, in theory, if

7   your allegation is true that defendants know who they're

8   threatening and how they threatened them.

9        So the fact that you're not telling me who is

10  threatened or how that person was threatened and who they

11  were threatened by, and when that happened isn't explained.

12  And the fact that there are sensitivities because the

13  defendants are already doing this.

14       Hang on.

15       You don't have to, and I'm never going to require

16  you to have the plaintiffs make an admission about their own

17  immigration status or whether or not the threat is potent.

18  The point is to could be a false report.  In other words,

19  the idea is you go there and without any basis report

20  someone as working illegally.  So I can control and I would

21  control the amount of information that could be

22  incriminating against the complaining witnesses or

23  plaintiffs, but that doesn't alleviate the burden that you

24  have to at least to identify for my sake and for the

25  defendant's sake.  They have a right to know what the

Proceedings                              13

1   allegation is, the who, what, where, when, and how I should

2   say.

3          MR. MIZRAHI:  We certainly have that information,

4   your Honor.  We can provide the Court with that information.

5   We can provided it to defendants.  To the extent it's

6   needed, we have it.  We're willing to provide it.

7          THE COURT:  To who?  To me and the defense?

8          MR. MIZRAHI:  Yes.  The only reason we haven't so

9   far is given the sensitivity of the issue.

10         MR. SIEGLER:  I'm sorry, your Honor, this doesn't

11  sound right.  Let's go back.  This is an attorney, no

12  offense, initially applied far this injunction without

13  anything.  Without any affidavit, right?  Right?  We had to

14  then -- I sent a letter to your Honor.  Your Honor said,

15  Please submit an affidavit he submitted an affidavit.

16         THE COURT:  Folks, we have a court reporter

17  everyone you have to slow down and use the microphone, pull

18  it closer.

19         MR. SIEGLER:  I'm sorry.

20         In the first place, there was no affidavit.  He

21  simply applied for this thing without any evidence.  Then

22  when I called him on it, or when your Honor called him on

23  it, he submitted an affidavit.  The first affidavit said

24  defendants, plural, all the defendants made threats.  That

25  was the December 6th affidavit.  The December 9th affidavit

Proceedings                                    14

1  he says it's Alex only.  This story has changed so many

2  times, your Honor.  And for counsel to sit there and

3  seriously suggest when we're here at the hearing today,

4  today is the day.  That some time later, he might provide or

5  he can provide.  I think that's not appropriate.

6          THE COURT:  Already.  Go ahead Mr. Mizrahi.

7          MR. MIZRAHI:  We're willing to provide it today.

8          Number two, the fact that Alex Briceno picked up

9  the phone and called a former employee of his father's

10  construction company who hadn't work there for over five,

11  six, seven, eight years speaks volumes.  Why would he ever

12  have a reason to contact this individual.  And, of course,

13  this individual received a -- where we can speak to the

14  specifics of the phone call -- but the fact that they're not

15  even disputing that this, you know, son of the boss.

16          THE COURT:  That's a problem.  Hang on.  The

17  problem is they can't dispute the purported threats to

18  report individuals to INS because you haven't told them what

19  they are.  I guess they could blanketly say I've never

20  threatened to tell INS about somebody but, again, you're

21  only alleging Alex Briceno and this lawyer doesn't represent

22  him yet.

23          MR. SIEGLER:  And won't.

24          MR. MIZRAHI:  There are three factual predicates,

25  your Honor, with respect to the immigration-related threats,

1  we believe they're straightforward enough that they either

2  happened or didn't happen.

3          With respect to the second threat there was a

4  physical assault on Carlos Martell.

5          THE COURT:  Of course, that we're going to address

6  today but I think you and I may not be communicating.  You

7  say they're straightforward enough.  I have no idea what

8  you're talking about because you've never told me when or

9  where or any details.  They may well be straightforward but

10 when you say, as you just did now, that there was someone

11 who used to work for maybe Alex Briceno, that Alex Briceno

12 contacted, I'm not sure that's particularly straightforward

13 with respect to this lawsuit since it sounds like neither of

14 those individuals is involved in this lawsuit.

15         MR. MIZRAHI:  Let me clarify, your Honor.

16         THE COURT:  Please.

17         MR. MIZRAHI:  The 12 plaintiffs that filed this

18 lawsuit, of the 12 plaintiffs, the majority of these

19 individuals hadn't worked for the company for over three or

20 four years.

21         THE COURT:  Okay.  How many of them hadn't?

22         MR. MIZRAHI:  There's a footnote in your reply

23 memorandum of law that breaks down the exact periods of time

24 of time.  I can find that footnote if you'd like.

25         THE COURT:  That's all right.

Proceedings                                    16

1          MR. MIZRAHI:  But I'm referring to Page 10 of

2    plaintiff's reply memorandum of law, Footnotes 20 through

3    22.

4          THE COURT:  All right.

5          MR. MIZRAHI:  So there is categories of

6    plaintiffs.  They filed a lawsuit against the construction

7    company.  The lawsuit was filed in September.  After filing

8    the lawsuit, two of these individual plaintiffs had received

9    unsolicited phone calls from Wladimir Briceno's son Alex.

10   Alex picked up the phone.  He called two of these

11   individuals and informed them in substance.  He said, If you

12   don't drop the lawsuit, I'm going to report you to the INS.

13   Why would he ever had a reason to pick up the phone to call

14   a plaintiff who worked for his father, who hadn't worked for

15   him for over nearly three years, you know, this is unusual.

16   That's number one.

17         THE COURT:  Let's back up for a moment.  I'm

18   looking at the paragraph to which you refer which is in your

19   reply.  It's really not the place to first articulate what

20   the alleged threat is but I don't see, and forgive me if I

21   missed it, what you just said which is that Alex Briceno

22   contacted them and said I'm going to report you to INS.

23         MR. MIZRAHI:  I'm referring, your Honor, to Page

24   10 of the reply simply to provide the Court with the

25   information concerning how long these individuals have been

Proceedings                                    17

1    out of work.

2          THE COURT:  Right.  But in any of the briefing did

3    you say -- do you state what you just said now that Alex

4    Briceno called, and then each of these individuals you

5    identified, and said, I'm going to report you to INS.

6          MR. MIZRAHI:  Your Honor, we're prepared to do it

7    today.  We understand there is an evidentiary hearing

8    scheduled today and my client is prepared to speak on it

9    today.

10         THE COURT:  All right.  I do want to hear about

11   that.

12         Now, I'll address as appropriate after I hear the

13   evidence this argument the defense makes about not having

14   sufficient notice and there being some kind of a due process

15   problem with just now notifying me about or then rather

16   about the exact nature of these threats of deportation.

17         Hang on.

18         The other question I want to ask you, though, is

19   what evidence do you have that Alex Briceno is acting on

20   behalf of the current defendants?  Is it only because why

21   else would he be doing it now?  Sort of a temporal inference

22   you want me to make it?

23         MR. MIZRAHI:  Your Honor, the evidence is

24   overwhelming.  There is direct evidence as identified in

25   admissions in defendant's affidavit in support of their

Proceedings                                    18

1   opposition consisting of text messages between Jeissy

2   Briceno and Alex Briceno.

3            THE COURT:  On December 2nd.

4            MR. MIZRAHI:  On December 2nd.

5            THE COURT:  What do you think is an admission?

6   She claims that she texted her brother because Mr. Martell

7   was in the same laundromat as Jeissy and was shaking and

8   that's reflected in this text as well.  And looked like, and

9   this is her characterization, he might be on drugs, I guess.

10  And that he was doing his laundry, meaning, Mr. Martell was

11  doing his laundry next to Jeissy and her boyfriend.

12           MR. MIZRAHI:  Well, correct me if I'm wrong.  I

13  believe the following facts are undisputed.  The lawsuit was

14  filed on September 2021.

15           THE COURT:  Right.

16           MR. MIZRAHI:  After the lawsuit was filed on

17  September 2021, Jeissy Briceno saw Carlos Martell at a

18  laundromat in Woodside, Queens.

19           THE WITNESS:  Right.

20           MR. MIZRAHI:  Within minutes of seeing Carlos

21  Martell at a laundromat in Woodside, Queens Jeissy Briceno

22  contacted her brother Alex.

23           THE COURT:  Right.

24           MR. MIZRAHI:  Within her affidavit, Jeissy Briceno

25  admits that Alex and Carlos may have some animus.  Alex may

```
                     Proceedings                    19
```

1    have some animus.

2          THE COURT:  They were yelling at each other.

3          MR. MIZRAHI:  No, no.  There is something in the

4    affidavit that says Alex has some animus towards Carlos

5    Martell.

6          THE COURT:  Relating to a woman.

7          MR. MIZRAHI:  Something about that.  There's some

8    animus there.

9          THE COURT:  Okay.

10         MR. MIZRAHI:  Within minutes after she had

11   contacted her brother, her brother physically assaults, you

12   know, assaults and batters Carlos Martell.

13         THE COURT:  You say it's undisputed.  Mr. Martell

14   says it, the defense does not.  All she says, Jeissy

15   Briceno, is that she didn't see a fight.  So I don't know if

16   you want do call it "undisputed."  Yes, there's no contrary

17   evidence that there was no fight.  All we have is a

18   statement by Jeissy Briceno that she did not see a fight.

19         MR. MIZRAHI:  There is also no contrary evidence

20   to the verbal threats that were communicated so.

21         THE COURT:  You say that again, yes.

22         MR. MIZRAHI:  She says that she didn't witness a

23   fight, but our affidavit clearly states that there were, you

24   know, three verbal threats communicated during the

25   altercation.

Proceedings                           20

1      THE COURT:  Okay.

2      MR. MIZRAHI:  Two from Alex, one from Jeissy, and,

3  you know, Jeissy doesn't offer anything in response to that

4  allegation.  She's silent as to that allegation.

5      THE COURT:  But, again, your argument is the

6  timing and the circumstances you think support an inference

7  that the reason behind the assault was to teach Mr. Martell

8  and anyone else a lesson with respect to bringing this

9  lawsuit.

10      MR. MIZRAHI:  Yes.

11      THE COURT:  Okay.  I did want to ask that of you,

12  Mr. Siegler, because the plaintiffs make the argument that

13  there are these undisputed facts.  By undisputed, it's

14  sometimes the silence as to those particular facts in Jeissy

15  Briceno's and defendant's response to which the plaintiffs

16  are referring.

17      So I do want to clarify:  Do the defendants

18  dispute that they had actual knowledge of this lawsuit prior

19  to December 2, 2021, and it could be as early as

20  September 2021 when the lawsuit was filed or October 12,

21  2021, when the complaint was served, or even November 2021

22  when the answers were filed?  Is there any dispute that your

23  clients were air a wear of the lawsuit before December 2,

24  2021.

25      MR. SIEGLER:  They knew about it.  I can't speak

Proceedings                                      21

1    for Alex because he's not here when he knew to about it.

2          THE COURT:  But does your clients?  Just speak

3    your clients.

4          MR. SIEGLER:  My clients knew about it.  They

5    hired a lawyer.

6          THE COURT:  Now, is there any dispute from your

7    clients regarding Alex Briceno threatening to report the

8    plaintiffs to the INS, or are your clients going to take the

9    position they have no idea.  I mean, what is their position

10   on this?

11         MR. SIEGLER:  Their position is all four of the

12   defendants:  Mom, dad, and the two sisters made absolutely

13   no threats to anybody especially about deportation given the

14   fact that Mr. Martell here is illegally and a lot of the

15   other plaintiffs are here illegally as far as she knows.

16         THE COURT:  The four named defendant say they

17   never personally made any threats to any plaintiffs about

18   reporting them to INS.

19         MR. SIEGLER:  Or asked anybody to act on their

20   behalf to do that.

21         THE COURT:  That's the question.  Do they further

22   say that they never asked Alex Briceno to do that?

23         MR. SIEGLER:  Exactly.  They never asked him to do

24   that.  Jeissy was as surprised as anybody when her brother

25   showed up and this altercation occurred.

Proceedings                                    22

1        THE COURT:  One thing at a time.  Is it further

2   the defense's position that they were unaware with of Alex

3   Briceno allegedly making these threats of going to INS?

4        MR. SIEGLER:  If it happened, yes, they're unaware

5   of it.

6        THE COURT:  All right.  Can I ask you a question,

7   though?  Is there any reason why that's not in an affidavit?

8   I don't want to delve into strategy, but since that's at the

9   heart of the plaintiff's factual allegations why isn't

10  anything in Jeissy Briceno's -- why isn't there anything

11  from any affidavit from any of the defendants about not

12  making threats of deportation and not being aware of any

13  such threats being made or getting anyone to make them.

14       MR. SIEGLER:  Your Honor, the allegations were so

15  vague and so conclusory without a shred of detail.  It is

16  and it was impossible to address that in any serious way.

17  It's like saying, you know, you know, Jason Mizrahi

18  committed murder.  It's fanciful.  So what we did instead,

19  your Honor, was Jeissy's affidavit we attached her text

20  messages from that evening and the text messages speak for

21  themselves.  She didn't say, Come down here right away and

22  assault this person because of a Fair Labor Standards Act

23  lawsuit.  There's nothing mentioned about the lawsuit, and I

24  think that that text -- and in discovery we'll get the

25  whole, you know, more or less thread if there's more to it.

Proceedings                               23

1    I don't think there's more.  We thought that addressed it.

2             I didn't feel as the attorney that Wladimir, the

3    mom, the dad, these are older people in their 70s, come on,

4    I just didn't need to address this allegation.

5             THE COURT:  Well, I mean, on the one hand, you're

6    complaining about process.  On the other, you didn't, in my

7    opinion, do as much as you could to at least dispel the

8    factual allegations you think are false.  You say it was

9    fanciful but -- and perhaps difficult -- because there's no

10   specificity with respect to these threats of deportation.

11   But you could clearly have submitted affidavits from each of

12   the defendants simply saying, "We have never," or, "I have

13   never threatened" to report any employees or the plaintiffs

14   to INS.  Nor have I asked anyone else to do it, nor was I

15   aware that anyone did so.

16            MR. SIEGLER:  Bear in mind, your Honor, that when

17   the Temporary Restraining Order was sought, Mr. Martel's

18   affidavit, I mentioned this before, said defendants made

19   threats.  On December 9th, after the Temporary Restraining

20   Order was in place in support of this application, she says,

21   Alex Briceno did it.  So I didn't feel, and I read that very

22   carefully, and I think that's a significant difference.  I

23   didn't feel that he was accusing my clients of engaging in

24   that behavior.  He said simply -- he says multiple times,

25   Alex is at the center of it.  Alex made the threat and even

Proceedings                                24

1    the proffer that counsel made this morning, I prefer to have

2    a witness, but counsel made a prefer about Alex.

3          So since Alex is not my client, I don't represent

4    Alex, I don't want to represent Alex.  Alex has his own

5    attorney, or should have his own phone for this, I know he

6    has a criminal attorney.  I didn't feel like it was

7    necessary to my clients to put facts on the record.

8          THE COURT:  Let me ask you.  Are your clients

9    willing to sign affidavits simply stating, I've never asked

10   anybody to threaten any of my employees or former employees

11   including the plaintiffs or however you want to word it with

12   going to INS regarding deportation.  Remember, this comes

13   down to facts and I have only your representation right now.

14   I understand, although I don't quite agree with the

15   strategy, that you used in terms of just not responding to

16   the allegations that were set forth in the January, I'm

17   sorry, December 9th motion papers by plaintiff.  But the

18   question is:  Can you produce such affidavits from your

19   clients in order to at least balance out the factual record

20   are sworn statements disclaiming any involvement in this.

21         MR. SIEGLER:  If there is a factual

22   allegation -- factual record with specifics, we're happy to.

23   Do you want a blanket "I never did this," I don't see a

24   problem with that.  I've talked to my clients.

25         THE COURT:  Okay.  Well, I'm going to get that

1  from Mr. Martell today under oath.  I want to hear what the

2  specifics are as to these threats.

3       MR. MIZRAHI:  We're prepared to speak on them,

4  your Honor.

5       Just to summarize what we have so far.  There are

6  three factual predicates underlying the emergency relief

7  sought.  There are the verbal threats targeted to the

8  certain individual plaintiffs' immigration statuses.

9       Number two, there's the physical assault on Carlos

10 Martell.  Number three, the threats of future violence

11 communicated by Alex and Jeissy.

12      So all three factual predicates each, you know,

13 warrant the entry of the emergency relief sought.  If your

14 Honor is prepared, I can have my client speak on his own

15 about each.

16      THE COURT:  I will in a moment.  But I do want to

17 ask Mr. Siegler a few more things about whether there is a

18 factual dispute.  So plaintiffs have also alleged that

19 Alexander Briceno assaulted Mr. Martell, or at least that

20 the two men engaged in a physical fight on December 2, 2021.

21      So, again, this is from the perspective of your

22 client who are the named defendants.  Do you dispute it, or

23 do your clients take the view that they have no information

24 one way or the other because it's a little difficult to

25 figure out what Jeissy Briceno's affidavit is saying.

Proceedings                             26

1          MR. SIEGLER:  I'm sorry, I think it's very clear

2    she was in a laundromat.  She heard yelling from the street,

3    she went to the door, she heard people yelling.  She went

4    outside the laundromat with her boyfriend and she saw two

5    people arguing.  She didn't see anybody strike anybody; she

6    saw two people arguing.  So she can't testify truthfully:  I

7    saw, you know, I saw so-and-so punch so-and-so.  She didn't

8    see it.

9          THE COURT:  She can't dispute that it happened but

10   she can certainly confirm that it did happen.

11         MR. SIEGLER:  Look, I don't know about that.

12   Mr. Briceno is innocent until proven guilty.  My client

13   didn't see an assault.  So I think we can dispute that it

14   happened.  I know there's pictures and all this other stuff,

15   and I have no reason to doubt Mr. Martell.  As far as what

16   my clients' position is, we can't testify what happened

17   either way.  We didn't see it.

18         THE COURT:  Okay.  And there is a statement that

19   Jeissy Briceno videotaped the incident?  Is there a

20   videotape?

21         MR. SIEGLER:  There is.

22         THE COURT:  And why hasn't anyone produced it?

23   Why haven't you produced it?  Does it corroborate what she

24   claims happened or didn't happen?

25         MR. SIEGLER:  I gave it to the criminal defense

Proceedings                    27

1    attorney.

2            THE COURT:  You gave the only copy?

3            MR. SIEGLER:  No, I have a copy; he has a copy.  I

4    gave it to him.

5            THE COURT:  I'd like to see it.

6            MR. SIEGLER:  Sure.  Okay.

7            THE COURT:  What does it show?

8            MR. SIEGLER:  It shows two people.  It actually

9    shows Mr. Martell backing away saying words to the effect

10   of, You got it, don't worry.  Go ahead.  Don't worry.  Just

11   watch and wait.  It shows two men shouting at each other.  I

12   think Jeissy does say something like, Why are you going

13   after my money, or something like that.  But it doesn't show

14   the context of who brought up the lawsuit or brought up

15   money first.

16           THE COURT:  Okay.  Sorry, I'm a little disturbed

17   by this, Mr. Siegler.  You have a piece of evidence that

18   seems to corroborate in part what the plaintiffs are

19   complaining, but yet, you didn't think it was appropriate to

20   acknowledge that especially when you know the plaintiffs

21   claim that there was such a videotape.  There's a certain

22   candor to the Court that I think, as you know, all lawyers

23   are bound by.

24           MR. SIEGLER:  Yes, and I'm being very candid now.

25   I saw a tape, I gave it to the defense attorney.  I thought

Proceedings                    28

1    that it might be, you know, irrelevant to that

2    investigation.

3          THE COURT:  Are you going to explain to me why she

4    said something about taking her money?  Is there any

5    explanation that -- or is there any inference I should make

6    other than it relates to this lawsuit?

7          MR. SIEGLER:  The information that I have is that

8    Mr. Martell brought it up first like now you're going to get

9    it because I'm suing you guys or something to that effect.

10          So that's what sparked my client saying why are

11   you going after my money or whatever she said.  But I'll be

12   happy to provide the tape to the Court and the tape to

13   counsel and they can -- I just don't want to be in a

14   position of prejudicing Mr. Briceno in a criminal matter.

15          THE COURT:  No, no, this is not you about

16   Mr. Briceno or just about him.  This is about whether

17   there's evidence that relates to the plaintiff's request

18   against your client, Jeissy Briceno, and her motivation in

19   contacting her brother that night or whether or not she was

20   involved in some effort as plaintiffs allege to retaliation

21   against or intimidate the plaintiffs in connection with this

22   lawsuit.  You know, this assault obviously was central to

23   their client and this videotape of this assault obviously

24   was a key piece of evidence.  I just don't know how you

25   don't disclose the fact that it exists and allow me to see

Proceedings                                    29

1   it or ask me to look at it in evaluating this claim.  I'm

2   distressed, quite honestly, to say the least.

3          What I'll probably do is I'll hear the evidence

4   and I might issue the injunction until I see this other

5   evidence assuming Mr. Martell testifies credibly.  But what

6   you're saying to me suggests that there is at least some

7   corroboration via this videotape regarding Mr. Martel's

8   account.  There might be another part of this story, but I

9   have not heard it yet with respect to any sufficiently

10  competent evidence.  I'm not going to rely just on the

11  affidavit from defense when I'm hearing from Mr. Mizrahi and

12  where there's a videotape that actually captures the

13  incident in question at least in part.

14         All right.  So obviously, with respect to the fact

15  or the allegation that Jeissy Briceno stated, This is what

16  happens when you try to take my money, or something to that

17  effect, you're not disputing that.

18         MR. SIEGLER:  No.

19         THE COURT:  Okay.  And the fact that Mr. Martell

20  sustained injuries, is it the defendant's position that they

21  don't have sufficient information to dispute it or they're

22  actually actively disputing it based on something they know.

23         MR. SIEGLER:  We can't testify to the injuries.

24  We saw pictures, we don't know the providence of the

25  pictures.  We know there was an arrest of Alex, but as far

1    as what injuries he suffered we don't know we can't know.

2              THE COURT:  All right.  Okay.  I do want to hear

3    from Mr. Martell.  So if you'll take the stand, sir.

4              And you'll have an opportunity to cross-examine,

5    which is certainly an opportunity to provide, certainly,

6    process for defendants.

7              Raise your right hand.

8    **CARLOS MARTELL**, called by the Plaintiff, having been first

9    duly sworn, was examined and testified as follows:

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  Have a seat.

12             COURTROOM DEPUTY:  State your name for the record.

13             THE WITNESS:  Carlos Martell.

14             THE COURT:  You may inquire.  Perhaps if you're

15   comfortable can you remain seated and use the microphone

16   because if you stand you won't be as intelligible.  Put the

17   microphone in front because you know you want to face your

18   witness.

19   DIRECT EXAMINATION

20   BY MR. MIZRAHI:

21   Q    Could you please repeat your first and last name.

22   A    Carlos Martell.

23   Q    Carlos, are you familiar with a company by the name of

24   W.B. Construction?

25   A    Yes.

1   Q    What is W.B. Construction?

2   A    A construction company.

3   Q    And how are you familiar with this construction

4   company?

5   A    I used to work for them.

6   Q    And when did you start working for this construction

7   company?

8   A    March or February 2016.

9   Q    And when did you stop working for this construction

10  company?

11  A    January 2020.

12  Q    So you worked at the company for about four years?

13  A    Correct.

14  Q    It's my understanding you filed a wage threat lawsuit

15  against the company; is that correct?

16          (A brief pause in the proceedings was held.)

17          THE COURT:  Keep your voice up.  You're doing fine

18  so far.

19          Go ahead.

20  Q    Sir, it's my understanding that you work for the

21  company for about four years?

22  A    Correct.

23  Q    It's also my understanding that you filed a wage theft

24  lawsuit against the company; is that correct?

25  A    Correct.

```
                   C. Martell - Direct/Mr. Mizrahi            32
```

1    Q    And do you know when the wage theft lawsuit was filed?

2    A    September 2021.

3    Q    Carlos, who is Wladimir Briceno?

4    A    The boss.

5    Q    When you say, "The boss," you're referring to the boss

6    of the construction company that you you used to work at?

7    A    Correct.

8    Q    Who is Jeissy Briceno?

9    A    The boss, also.

10   Q    And who is Jeimy Briceno?

11   A    The boss.

12   Q    And who is Betty Briceno?

13   A    The mother of the sisters, Jeissy and Jeimy.

14   Q    That would also make her Wladimir's wife?

15   A    Correct.

16   Q    Who is Alexander Briceno?

17   A    Jeimy and Jeissy's brother.

18   Q    That would also make him Wladimir and Betty's son; is

19   that correct?

20   A    Correct.

21   Q    Before the filing of this lawsuit in September 2021,

22   had you and Alexander Briceno ever gotten into a physical

23   confrontation?

24   A    No.

25   Q    Before the filing of this lawsuit in September of 2021,

C. Martell - Direct/Mr. Mizrahi                33

1  had you and Alexander ever gotten into a verbal

2  confrontation?

3  A    No.

4  Q    After the filing of this lawsuit in September of 2021,

5  have any of the Briceno's ever contacted any of your fellow

6  plaintiffs?

7  A    Yes.

8            MR. SIEGLER:  Objection.  Calls for hearsay.

9            THE COURT:  Overruled.  Go a little slower with

10  your questions.

11  Q    Which of the Bricenos contacted your fellow plaintiffs

12  after this lawsuit was filed?

13  A    Alex.

14  Q    You're referring to Alexander Briceno?

15  A    Correct.

16  Q    To your knowledge, what did Alex say to your fellow

17  plaintiffs?

18            MR. SIEGLER:  Objection, hearsay.

19            THE COURT:  Overruled.  You have a standing

20  objection to the hearsay but I'm going to allow it.

21            MR. SIEGLER:  Thank you, Judge.

22  Q    To your knowledge, what did Alex say to your fellow

23  plaintiffs?

24  A    That if they don't take their name off the lawsuit that

25  they're going to call INS, ICE, immigration.

C. Martell - Direct/Mr. Mizrahi                    34

1   Q    Could you repeat your answer, please.

2   A    That if they don't take their names off the list

3   they're going to call ICE on them.

4   Q    When you say, "List," you're referring to the

5   wage-and-hour lawsuit?

6   A    Correct.

7   Q    And how do you know that these conversations took

8   place?

9   A    They were told to me.

10  Q    Do you know how these conversations took place?

11  A    Through phone calls.

12  Q    When you had stated that they were told to you, who

13  were they told to you by?

14  A    My fellow co-workers.

15  Q    Is there a reason why you're not referring to your

16  fellow co-workers by their names?

17  A    They're scared for their safety.

18  Q    When you say that they're scared for their safety,

19  could you elaborate on that?

20  A    None of them are here legally, so they're scared to get

21  deported.

22  Q    Carlos, what happened the evening of December 2, 2021?

23  A    I was attacked.

24  Q    Where were you attacked?

25  A    I was at a laundromat.

C. Martell - Direct/Mr. Mizrahi                35

1    Q    Was that the laundromat known as Turbo Laundry Limited
2    laundromat in Woodside, New York?
3    A    Correct.
4    Q    Approximately what time were you attacked?
5    A    8:30.
6    Q    Would that be 8:30 in the evening?
7    A    Correct.
8    Q    Who attacked you?
9    A    Alex.
10   Q    You're referring to Alexander Briceno?
11   A    Correct.
12   Q    Was anybody else there when you were attacked?
13   A    Yes.
14   Q    Who else was there when you were attacked?
15   A    Jeissy and her husband.
16   Q    You're referring to Jeissy Briceno?
17   A    Yes.
18   Q    And you're referring to a man?
19   A    Correct.
20   Q    Who was there with Jeissy Briceno?
21   A    Correct.
22   Q    During the attack, did Alex Briceno say anything to
23   you?
24   A    Yes.
25   Q    What did Alex say to you?

```
 1   A    This is going to happen to everybody that's on the

 2   list, meaning, the lawsuit.  And that to be careful with my

 3   family, he's coming after my family.

 4   Q    During the attack, did Jeissy say anything to you?

 5   A    Yes.

 6   Q    What did she say?

 7              THE WITNESS:  Can I curse?

 8              THE COURT:  Yes, you may.

 9   A    While holding the phone recording, she says, "You bitch

10   ass nigga, this is going to happen to everybody that tries

11   to take my money."

12   Q    You had had mentioned that Jeissy was recording the

13   altercation; is that correct?

14   A    Yes.

15   Q    What was she recording with?

16   A    With her phone.

17   Q    Carlos, did you sustain any injuries as a result of the

18   attack?

19   A    Yes.

20   Q    What injuries did you sustain?

21   A    My eye, my forehead, my neck, my head, back of the

22   head.

23   Q    Did you photograph any of these injuries?

24   A    Yes.

25              MR. MIZRAHI:  May I approach the witness?
```

C. Martell - Direct/Mr. Mizrahi                    37

1          THE COURT:  You may.

2    Q    Carlos, I'm showing you a document that has been

3    labeled as Exhibit A.  It has been filed on ECF as Docket

4    No. 49-1.  Could you please familiarize yourself with these

5    photographs.

6    A    (Complying).

7    Q    Are these photographs that you had taken of yourself

8    after the attack on December 2, 2021?

9          THE COURT:  Mr. Siegler, do you want see what he's

10   referring to?

11         MR. SIEGLER:  I'll stipulate into evidence.

12         THE COURT:  Okay.  Those can be admitted the

13   photographs.

14         (Plaintiff's Exhibit A was received in evidence as

15   of this date.)

16         THE COURT:  Can I ask you a question, though, who

17   took these photographs?

18         THE WITNESS:  Me.

19         THE COURT:  You did a selfie?

20         THE WITNESS:  I was taking videos the day of the

21   day after because of progressions.

22         THE COURT:  Okay.  And so, how soon after the

23   incident did you --

24         THE WITNESS:  When I woke up in the morning,

25   December 3rd, on a Friday.

C. Martell - Direct/Mr. Mizrahi          38

1      THE COURT:  All right.  And the incident occurred

2  at what time on December 2nd roughly?

3      THE WITNESS:  8:30ish, around there.

4      THE COURT:  Okay.  And right after the incident,

5  did you have any kind of black-and-blue marks or anything?

6      THE WITNESS:  Swelling, a lot of swelling.  I have

7  a picture of that.  Also, when you see I get a day after

8  that's when you see the black-and-blues and everything.

9      THE COURT:  Go ahead, Mr. Mizrahi.

10  EXAMINATION BY

11  MR. MIZRAHI:

12  (Continuing.)

13  Q    Carlos, do you think Alex Briceno, Jeissy Briceno, or

14  any of the other Bricenos may assault you in the future?

15      MR. SIEGLER:  Objection, leading.

16      THE COURT:  Sustained.  Sustained.

17  Q    Carlos, it's my understanding that following this

18  altercation you went to the 114th Precinct in Queens; is

19  that correct?

20  A    Correct.

21  Q    And you went to the 114th Precinct in Queens to meet

22  with anyone?

23  A    Officer.

24  Q    You met with an officer at the 114th Precinct?

25  A    Correct.

1   Q    And when you were at the 114th Precinct, what did you

2   tell the officer?

3   A    That I was assaulted at the laundromat by Alex and he

4   made me say everything.

5   Q    When you say, "He made you say everything," you're

6   referring to the testimony that you had given here today?

7   A    Correct.

8   Q    You're also referring to the testimony that you had

9   provided in the form of your affidavit?

10   A    Correct.

11   Q    That we mad submitted in connection with the

12   preliminary injunction?

13   A    Correct.

14   Q    Carlos, I'm showing you another document that's been

15   labeled Exhibit B.  This document has been filed on ECF as

16   Document No. 49-2.  Please take a moment to familiarize

17   yourself with this document.  Let me know when you're

18   finished.

19         MR. SIEGLER:  Your Honor, we'll stipulate that

20   Mr. Martell went to the police, filed a report.  There was

21   an arrest, there was an charge, and everything after the

22   incident.

23         THE COURT:  Okay.  So you have no objection to the

24   introduction of the police report?

25         MR. SIEGLER:  No.

1    THE COURT:  All right.  So that's admitted I have

2    a copy of that all right.

3    (Plaintiff's Exhibit B was received in evidence as

4    of this date.)

5    THE COURT:  Go ahead.  If you want to ask any

6    questions about the reporting to the police.  And I think

7    also the defense would stipulate that there has been a

8    criminal proceeding that followed thereafter with respect to

9    Alex Briceno.

10   MR. SIEGLER:  Correct.

11   EXAMINATION BY

12   MR. MIZRAHI:

13   (Continuing.)

14   Q    It is my understanding based on the information that

15   you had provided to the officer at the 114th Precinct that

16   the charge was filed for assault and battery; is that

17   correct?

18   A    Correct.

19   Q    It is also my understanding that after the filing of

20   this charge against Alexander Briceno a Temporary

21   Restraining Order had been entered against him by a criminal

22   court in Queens; is that correct?

23   A    Correct.

24   Q    It is my understanding that that Temporary Restraining

25   Order is only against Alex Briceno; is that correct?

C. Martell - Direct/Mr. Mizrahi          41

1   A    Correct.

2   Q    And it's also my understanding that the Temporary

3   Restraining Order is only in your favor and it doesn't cover

4   any of your other co-workers; is that correct?

5   A    Correct.

6            THE COURT:  You don't need to ask the witness

7   these questions.

8            MR. MIZRAHI:  Your Honor, I have no further

9   questions.

10           THE COURT:  I would like to go back and hear more

11  from you about what happened and what you know.

12           So let's go back first to the alleged threats by

13  Alex Briceno against some of your co-workers to report them

14  to INS.

15           When was the first time any of your co-workers

16  said -- told you about such threats?

17           THE WITNESS:  Say about when they first got the

18  letter, the lawsuit letter.

19           THE COURT:  What do you mean by the lawsuit

20  letter?

21           THE WITNESS:  When they got served.

22           THE COURT:  So who got served?

23           THE WITNESS:  The sisters.

24           THE COURT:  Okay.

25           THE WITNESS:  The sisters got served, Jeissy and

Proceedings                          42

1   Jeimy got served.

2          THE COURT:  Do you know when that happened.

3          THE WITNESS:  No, not exactly.

4          THE COURT:  Why did you peg the conversation you

5   had with your colleagues to that date?  In other words, it

6   wasn't your colleague who is got served but it was the

7   defendants.

8          THE WITNESS:  Correct.  So they probably told Alex

9   and Alex called the workers.

10          THE COURT:  No, I don't mean that.  In other

11   words, how is it that you know that you got you started

12   getting complaints from your friends or former workers after

13   the defendants were served?

14          THE WITNESS:  Because we went to the lawyer.  And

15   after we went to see the lawyer, that's when everything

16   started happening.

17          THE COURT:  Break that down for me.  You and some

18   of your former co-workers for the defendants went to your

19   lawyer.

20          THE WITNESS:  Correct.

21          THE COURT:  And who is your lawyer?

22          THE WITNESS:  Jason.

23          THE COURT:  Mr. Mizrahi?

24          THE WITNESS:  Mr. Mizrahi.

25          THE COURT:  When did that happen?

```
                         Proceedings                       43
```

1          THE WITNESS:  We went there beginning of
2     September.
3          THE COURT:  Okay.
4          THE WITNESS:  I'll say the first week of
5     September.
6          THE COURT:  Okay.  Why did you go there, just
7     generally speaking.  Don't tell me what was said but why did
8     you go there?
9          THE WITNESS:  To see about wage theft about
10    overtime that was taken way from us.
11         THE COURT:  Did you go there to talk about maybe
12    filing a lawsuit?
13         THE WITNESS:  Correct.
14         THE COURT:  Okay.  And so, that was you and how
15    many other individuals?
16         THE WITNESS:  Me and another individual.
17         THE COURT:  Just one other?
18         THE WITNESS:  Yeah, one other.
19         THE COURT:  Okay.  And how does that meeting at
20    all connect with your former co-workers complaining about
21    these threats?
22         THE WITNESS:  They used to work with me, also.
23         THE COURT:  Okay.
24         THE WITNESS:  They have to come and speak to Jason
25    about the same lawsuit.

Proceedings                    44

1          THE COURT:  Okay.  But, again, when was the first
2    time that one of your co-workers said to you that Alex
3    Briceno had threatened them with going to INS?
4          THE WITNESS:  I guess after they got their
5    paperwork saying that they were suing them.
6          THE COURT:  How did you know that it was after he
7    got the paperwork?
8          THE WITNESS:  Alex told one of the guys, we see
9    that you're suing us and that's when they continued to make
10   the threats.
11         THE COURT:  I see.  So that was part of the
12   conversation between Alex and one of your co-workers.
13         THE WITNESS:  Correct.
14         THE COURT:  How many of these co-workers of yours
15   received such calls from Alex Briceno?
16         THE WITNESS: To my knowledge, two.
17         THE COURT:  Two.  And without identifying them,
18   are they plaintiffs in this lawsuit?
19         THE WITNESS:  Correct.
20         THE COURT:  And describe what each of those
21   individuals told you about the conversation with Alex
22   Briceno.
23         THE WITNESS:  He called them and asked them why
24   we're doing this and to take their names off because he
25   could further put more -- he could charge them with stuff,

Proceedings                                        45

1    meaning, he could charge them and call ICE on them.

2            THE COURT:  Did say that?

3            THE WITNESS:  ICE, yes.

4            THE COURT:  He specifically referred to ice when

5    speaking to both of them?

6            THE WITNESS:  Both of them, yes.

7            THE COURT:  Now, were both of those people

8    together when they got the call?

9            THE WITNESS:  No.

10           THE COURT:  Do you know how close in time when

11   each of them received these calls?

12           THE WITNESS:  No.

13           THE COURT:  When did they first report the calls

14   to you?  Do you remember roughly what month?

15           THE WITNESS:  September, right after they got the

16   letter saying that they're getting sued.

17           THE COURT:  Okay.  Let me ask you a question, and

18   this is -- I'm trying to pin down the time again.

19           If I told you that the lawsuits weren't actually

20   served until October, would that affect your memory as to

21   the timing of when your colleagues told you about the phone

22   calls?

23           THE WITNESS: I don't remember the exact date when

24   they told me.  But they told me after they got served,

25   that's how I knew they knew already.  They called me and

Proceedings                                    46

1   told me they got served already and there is what they told

2   me.

3              THE COURT:  And did your colleagues say how it is

4   that Alex could call them?  How it is that he had their

5   phone number?

6              THE WITNESS:  They used to work together.  We all

7   worked in the same company and so he had our phone numbers.

8              THE COURT:  The phone was a hard line or a cell

9   phone?

10             THE WITNESS:  I don't know.

11             THE COURT:  And each of these individuals, are

12  they working somewhere else now and not for the defendants?

13             THE WITNESS:  Correct.

14             THE COURT:  And how long ago did you work for the

15  defendants?

16             THE WITNESS:  January 2020 was the last month I

17  worked there, the end of January.  I think it was 28th, I'm

18  not sure of the date.

19             THE COURT:  Did you ever work directly for Alex

20  Briceno?

21             THE WITNESS:  No.

22             MR. MIZRAHI:  Objection, your Honor.  I just

23  wanted to make the distinction between their allegations in

24  the amended complaint that included Alex Briceno as an

25  employer.

Proceedings                                    47

1      THE COURT:  Yes.  That's why I'm asking.

2      MR. MIZRAHI:  And I just wanted to include the

3  objection to state that there's a difference between, you

4  know, working for a construction company and then the legal

5  arguments concerning employer liability.

6      THE COURT:  Okay.  Hang on.  Hang on.  I'm

7  overruling your objection because this is just a fact.  I'm

8  asking him a question of if he ever directly worked for him?

9  You can make whatever argument you want about the alleged

10 employer status of Mr. Alex Briceno.  But I'm overruling

11 your objection.  I'm simply asking if this plaintiff ever

12 worked directly for Alex Briceno.

13      MR. MIZRAHI:  Excuse my interruption, your Honor.

14      THE COURT:  No, it's all right.

15      When you worked for WB Maintenance & Design Group,

16 did you have -- or any of the W.B. organizations -- I guess

17 it is W.B. and Son Construction.

18      You worked for both; is that right?

19      THE WITNESS:  It's one.

20      THE COURT:  It's one.  Did you ever see Alex

21 Briceno on the job sites or in the office?

22      THE WITNESS:  Yes.

23      THE COURT:  Okay.  And I know this is hearsay, and

24 the defense will object, but what was your understanding

25 about Alex Briceno's role in the company at the timings you

Proceedings                                48

1   saw him.

2          THE WITNESS:  He's the boss of his own company.

3          THE COURT:  A separate company?

4          THE WITNESS:  A separate company.

5          THE COURT:  That you never worked for?

6          THE WITNESS:  Never.

7          THE COURT:  Did any of the other plaintiffs, as

8   far as you know, worked for Alex Briceno's other company?

9          THE WITNESS:  Alex use to work with W.B. so a lot

10  of the guys that worked in W.B. worked with him then he has

11  his own company.

12         THE COURT:  I see.  But when the other guys worked

13  with Alex, he was a worker like them and wasn't supervising?

14         THE WITNESS:  He was a boss.

15         THE COURT:  Then he created his own company?

16         THE WITNESS:  Correct.

17         THE COURT:  All right.  Now, let's turn for a

18  moment to the assault.

19         Describe to me what happened on the day from the

20  moment you arrived at the laundromat.

21         THE WITNESS:  I could start?

22         THE COURT:  Yes, please.

23         THE WITNESS:  I pulled in.  The laundromat is on

24  Northern Boulevard.  The reason I go to that laundromat is

25  because you could pull in with your car, it's a drive-thru.

Proceedings                                49

1   Basically you could park on the sidewalk.  It's easier to

2   unload all the laundry when it's in the trunk of your car,

3   you walk right through the doors.

4         I took out the laundry, put the laundry right in

5   front of the machine.  I walked to get quarters.  I see when

6   I go to get quarters, I see somebody looking at me but I

7   just don't know who it is; I don't really look at anybody.

8   I took my quarters, walked back to the machine.  I put my

9   quarters in I still se somebody looking at me but I still

10  didn't question it, it's just a laundromat.  I put the

11  quarters into the machine and my car, like I said, is parked

12  right outside because you could park on the sidewalk.

13        So I walk right outside.  The laundry machine

14  takes half an hour to do.  So I went in the car, got on the

15  phone, spoke to my son for like five, ten minutes.  Hung up

16  the phone, put on my lap.  I still had 20 minutes, 15

17  minutes for the laundry to be done.

18        I took a little nap, I put the seat back.  I took

19  a little nap.  I didn't lock the doors.  The doors were

20  closed but not locked.  So I laid down, closed my eyes, and

21  I woke up to getting hit.

22        THE COURT:  You mean inside your car?

23        THE WITNESS:  Inside my car, they opened the door.

24        THE COURT:  Who is they?

25        THE WITNESS:  I didn't know what was happening at

Proceedings                                          50

1    this second.  My eyes were closed.  My eyes were closed, I

2    was resting, 15 minutes left on the thing.  When I just feel

3    the door getting opened and getting hit.

4              THE COURT:  In the what?

5              THE WITNESS:  In the car.

6              THE COURT:  What part of your body?

7              THE WITNESS:  In my face.

8              THE COURT:  Opened fist?  Closed fist?  Hand?

9              THE WITNESS:  I woke up to them.  So I managed to,

10   you know, the center console for your arm, I kicked out,

11   kicked who was on top of me out.  I managed to get out.  I

12   had a zip-up hoodie, a hoodie jacket.  So I got put over my

13   head and he started hitting me with uppercuts.

14             THE COURT:  To where?

15             THE WITNESS:  My face.  I'm kind of slim, so I

16   managed to get out of the sweater as they pulled it over me.

17   Then, as I was looking up, that's when I saw what was

18   happening.  I see Alex, I see Jeissy's husband, I see Jeissy

19   filming everything.  And in the midst of it, Alex is saying

20   "Come fight, fight".  And he says this is going to happen.

21   He said this is going to happen -- more than that is going

22   to happen to your family.  And whoever signed the lawsuit,

23   it's going to happen to them, also.  As he's saying that,

24   Jeissy is filming whatever she filmed.  And she goes curse

25   again.  She says, "You bitch ass nigga, this is going to

Proceedings                                              51

1    happen to whoever tries to take my money."  And I'm backing

2    up.

3              THE COURT:  Did you say anything in response?

4              THE WITNESS:  Y'all got this, no problem.  Y'all

5    got this.  We see y'all got this.

6              THE COURT:  When did you say that?

7              THE WITNESS:  As I'm backing up because there's

8    two men, Alex, and her husband.

9              THE COURT:  Let's go back over this a little bit.

10             When you said you were in the laundromat you

11   noticed -- did you actually see someone looking at you, or

12   you just felt it or you saw it out of the corner of your

13   eye?

14             THE WITNESS:  Yeah out of the corner of my eye.  I

15   don't really -- I don't know anybody in -- I go to the

16   laundry.  I wasn't paying attention to anybody at all.

17             THE COURT:  Did you have a sense of how far away

18   that person was?

19             THE WITNESS:  Yeah, definitely.  I would say about

20   30 to 40 feet away from me.  There was at least ten

21   machines, ten machines, I guess.  It's a big laundromat,

22   it's an very big laundromat.

23             THE COURT:  And when you loaded your machine was

24   anybody close by you?

25             THE WITNESS:  Yeah, there was.

                         Proceedings                    52

1            THE COURT:  Either machine?

2            THE WITNESS:  No, no.  There was a lot of empty

3    ones.  A lot of empty ones.

4            THE COURT:  Did you see anyone right next to you

5    on either side when you were loading your machine?

6            THE WITNESS:  No.

7            THE COURT:  When you were loading your machine?

8            THE WITNESS:  No.

9            THE COURT:  So while you were inside the

10   laundromat, you don't recall ever seeing Jeissy Briceno or

11   her husband?

12           THE WITNESS:  No.

13           THE COURT:  Okay.

14           THE WITNESS:  I never knew what her husband looked

15   like.  So the person that was looking at me turned out to be

16   her husband.

17           THE COURT:  Okay.

18           THE WITNESS:  I never seen him, I didn't know who

19   he was.  So, like I said, till after I could see who he was,

20   and I hear her say, "Come on, babe, let's go," that's a term

21   of endearment for a significant other, that's how I figured

22   out that's the husband.

23           THE COURT:  And do you know that person's name?

24           THE WITNESS:  No.

25           THE COURT:  Okay.  Because you never met him

```
                        Proceedings                    53
```

1   before?

2          THE WITNESS:  Never met him.

3          THE COURT:  Okay.  So the whole time then you were

4   in the laundromat, you didn't realize that Jeissy Briceno

5   and her husband were there, also?

6          THE WITNESS:  No.

7          THE COURT:  Okay.  You said then you go into your

8   car, you fall asleep while your laundry is --

9          THE WITNESS:  Being done.

10         THE COURT:  Being done.  And you wake up to

11  someone hitting you.

12         THE WITNESS:  Correct.

13         THE COURT:  Are you in the driver's side or the

14  passenger's side.

15         THE WITNESS:  Driver's side.

16         THE COURT:  You managed to get out?

17         THE WITNESS:  Correct.

18         THE COURT:  Kick your way out.

19         THE WITNESS:  Correct.

20         THE COURT:  And you say that Jeissy Briceno -- you

21  said that Alex Briceno made this comment to you about --

22  excuse me?

23         THE WITNESS:  After hitting me.  After I got out.

24         THE COURT:  Yes.

25         THE WITNESS:  He said that.

Proceedings                              54

1          THE COURT:  And so, are you fighting with him at

2     all?

3          THE WITNESS:  No, I couldn't.  I woke up to hits

4     and then I escaped.  And that's when I was backing up and

5     that's when they were filming.  I didn't know what was

6     happening.

7          THE COURT:  Did you ever throw a punch or do

8     anything against --

9          THE WITNESS:  No.

10          THE COURT:  Hang on.  Against either Alex Briceno,

11     the husband, or Jeissy Briceno?

12          THE WITNESS:  No.

13          THE COURT:  Did you do anything to block any, or

14     actually, let me back up.

15          When you kicked your way out of the car, did

16     anyone hit you again?

17          THE WITNESS:  Yes.

18          THE COURT:  And who did that?

19          THE WITNESS:  Alex.

20          THE COURT:  You said upper cuts, right?

21          THE WITNESS:  Yes.

22          THE COURT:  Did you do anything to defend

23     yourself?

24          THE WITNESS:  I didn't know what was happening.  I

25     just tried to get away from the situation.  I didn't know

Proceedings                                    55

1   what was happening, I woke up to punches.

2          THE COURT:  In relation to the upper cuts, when

3   did Alex Briceno make those comments?  Before, after,

4   during?

5          THE WITNESS:  After.

6          THE COURT:  Okay.

7          THE WITNESS:  While I'm backing up.

8          THE COURT:  I see, October.

9          Where is Jeissy Briceno in relation to Alex and

10  you?

11         THE WITNESS:  She's on that with them closer to

12  the laundromat.  I'm backing away from the laundromat.

13         THE COURT:  Okay.

14         THE WITNESS:  So I was kind of going towards the

15  street already.

16         THE COURT:  All right.  And then, when does she

17  make the comments that you said?

18         THE WITNESS:  While I'm backing up.

19         THE COURT:  All right.  And when do you say, I got

20  it?

21         THE WITNESS:  You got it.  I told her, You got it.

22         THE COURT:  Did you say that after Jeissy said

23  what she said?

24         THE WITNESS:  Correct.

25         THE COURT:  Okay.  And then what happened after

Proceedings                                          56

1    you backed up?

2           THE WITNESS:  I was backing up and they wanted to

3    fight.  And I just -- I'm not going to fight.

4           THE COURT:  How about the husband?  Did he try to

5    fight with you, too?

6           THE WITNESS:  They were both coming at me.

7           THE COURT:  Who is the both?

8           THE WITNESS:  Alex and her husband.

9           THE COURT:  Okay.  And what was Jeissy doing?

10          THE WITNESS:  Filming.

11          THE COURT:  Okay.  And so, you backed up.  How do

12   you --

13          THE WITNESS:  Walking backwards.

14          THE COURT:  Towards the street?

15          THE WITNESS:  On the sidewalk, there's a highway,

16   that's the BQE right there.  As I'm walking, as I see them

17   coming towards, I'm backing up also because it's two guys.

18          THE COURT:  And what happens then?

19          THE WITNESS:  I see that -- they see I didn't want

20   to fight.  So Alex, I guess they were doing the laundry,

21   Jeissy and her husband were doing the laundry.  I see Alex

22   getting into his car, a white truck, gets into his car and

23   tells Jeissy, Let's go, let's go.

24          THE COURT:  So they don't continue to pursue you

25   after you back up?

```
                        Proceedings                    57
```

1              THE WITNESS:  No, no that's it.

2              THE COURT:  They leave?

3              THE WITNESS:  They leave.

4              THE COURT:  So who leaves?

5              THE WITNESS:  I seen Alex get in his truck.  So I

6      seen it was safe for me to get in my car.  I see Jeissy walk

7      inside with her husband.

8              THE COURT:  To the laundromat?

9              THE WITNESS:  To the laundromat.  I left my

10     clothes there and I called my sister to come and get the

11     clothes.

12             THE COURT:  I see.

13             And did she do that?

14             THE WITNESS:  Correct, yeah.

15             THE COURT:  So you recovered your clothes from the

16     laundromat?

17             THE WITNESS:  Correct.

18             THE COURT:  Okay.  You went to the police the next

19     day?

20             THE WITNESS:  Correct.

21             THE COURT:  Why didn't you go that night?

22             THE WITNESS:  I didn't go that night because I

23     went home.  And I went home and seen my face.  I wanted to

24     speak to the attorney about what I did.  I was never

25     involved in anything like this.  When I spoke to him, he

Proceedings                                  58

1  told me go to the precinct.  Only thing is that it was on a

2  Friday.  So, on a Friday -- my son lives in Connecticut -- I

3  have to pick him up on Fridays from school.  At school over

4  there, it's a little bit different.  You have to line up, so

5  I need to be there by certain time.  I didn't know how long

6  it was going to be at the precinct.  So what I did was I

7  picked him up, brought him to my mom's, told my mom to watch

8  him.  After that, with traffic from Connecticut to New York,

9  I went there at like 5:30 to the precinct.

10         THE COURT:  Now, there's been an allegation that

11 at the time you were working for defendants you were using

12 drugs.  Did you see that allegation.

13         THE WITNESS:  Yes, I seen it.

14         THE COURT:  So I have to ask you.  Were you using

15 drugs at the time of this incident?

16         THE WITNESS:  No, ma'am.

17         THE COURT:  None at all?

18         THE WITNESS:  No.

19         THE COURT:  You were described as shaking.  Is

20 that an accurate description of how you were in the

21 laundromat?

22         THE WITNESS:  No.

23         THE COURT:  All right.  Were you taking anything,

24 or was there anything that might affect your memory as to

25 what happened during this incident?

C. Martell - Direct/Mr. Mizrahi          59

1          THE WITNESS:  No.

2          THE COURT:  Do you want do ask any other

3    follow-up, Mr. Mizrahi, before I let Mr. Siegler cross?

4    DIRECT EXAMINATION

5    BY MR. MIZRAHI:

6    (Continuing.)

7    Q    Do you know what kind of car Alex Briceno was driving

8    that night?

9    A    A white pick-up truck.

10   Q    Can you describe it?

11   A    White.  Usually, trucks have a flatbed.  It didn't have

12   a flatbed, it has like a bubble so you can store stuff,

13   construction stuff, or something like that.

14         THE COURT:  Actually, I do have one other

15   question.

16         You said that your former co-workers told you

17   about Alex Briceno called them after he got the lawsuit.

18         Now, you're aware that he's not named in the

19   lawsuit, right?

20         THE WITNESS:  Correct.

21         THE COURT:  Okay.  Can you explain that if you

22   know?

23         THE WITNESS:  I don't know, but he's an older

24   brother.  That's the only reason.

25         THE COURT:  He didn't say anything about -- did he

1   say anything specifically about getting served to your

2   co-workers?

3              THE WITNESS:  No, I honestly don't know that.

4   They just called me telling me this is what he said to me.

5   They were scared of being deported, so that's why I called

6   the lawyer asking should they be nervous and the lawyer say

7   no.

8              THE COURT:  Mr. Siegler, your witness for cross.

9              MR. SIEGLER:  Thank you.

10  CROSS-EXAMINATION

11  BY MR. SIEGLER:

12  Q    What's the name of the people that contacted you about

13  INS?

14             THE COURT:  Well, let's hold on one second.  I

15  think we should set up some kind of a protective order.  I

16  am concerned about actually in some ways weaponizing the

17  threat itself.

18             MR. SIEGLER:  They're plaintiffs to the case, so

19  we're going to know their names, their addresses.

20             THE COURT:  Right.  But I think -- well, listen, I

21  think what is true, Mr. Mizrahi, is that if the allegation

22  is true, the defendants already know who these individuals

23  are but that actually cuts against plaintiffs keeping it a

24  secret.  What I don't want to have to is it being in the

25  public record because, at this point, I don't want anything

C. Martell - Cross/Mr. Siegler          61

1  to happen with respect to them if they, in fact, have any

2  issues regarding their immigration status.

3           MR. SIEGLER:  Your Honor, we do FLSA cases all the

4  time and many, many plaintiffs in FLSA cases are here

5  without papers.  It's never been a problem, it's not my

6  concern, it's not your concern.

7           THE COURT:  No, no, it is my concern.  If these

8  allegations are true that your clients are threatening to

9  expose them.

10          MR. SIEGLER:  Not my clients, some other client

11  that's not here today.

12          THE COURT:  No, but the allegation is that it's

13  because of the lawsuit and Alex Briceno is working with his

14  family members who are the defendants in this case.

15          MR. SIEGLER:  There's been no evidence of that.

16  Only Jeissy making one comment.  That's the only evidence

17  tying these two together.  I have three defendants who have

18  done absolutely nothing.  There's been no testimony about

19  mom, dad, and the other sister.

20          THE COURT:  That's your argument but I disagree

21  with you, Mr. Siegler.  The testimony, and the question is

22  if I accept it, is that Alex Briceno, though, he's not named

23  as a defendant knew that the lawsuit was filed against his

24  family members, his sisters and his parents.  So that, if

25  credited, certainly indicates that they're working together

Proceedings                                              62

1    and that your clients are either approving or requesting

2    that he take this action, he being Alex Briceno.  So that

3    there is evidence to that effect.  And the question is

4    whether or not I credit the testimony I'm hearing.

5              I want to figure out how to deal with this

6    sensitive issue.  I'm going to seal this part of the

7    transcript, but I do want you to identify the two plaintiffs

8    who receive these calls.

9              THE WITNESS:  Say them?

10             THE COURT:  Yes, say their names.

11             MR. MIZRAHI:  You can go ahead.





C. Martell - Cross/Mr. Siegler                    63

23   Q    Who is Sasha Peña?

24   A    My son's mother.

25        MR. MIZRAHI:  I'm going to raise an objection and

C. Martell - Cross/Mr. Siegler                    64

1   I'm going to ask opposing counsel to tread very carefully

2   here.

3            THE COURT:  Hold on one second.

4            The only part of the transcript to sealed just

5   before Mr. Siegler starts his cross.

6            MR. MIZRAHI:  We're going raise a relevancy

7   objection here and I'm going to ask opposing counsel to

8   tread very carefully because there is a very fine line into

9   what is --

10           THE COURT:  Let me hear from Mr. Siegler.  What's

11  the relevance of his --

12           MR. SIEGLER:  The evidence may show that the fight

13  had nothing to do with a lawsuit, and rather, was about some

14  romantic entanglement between these three people.

15           THE COURT:  It was certainly suggested in the

16  affidavit.  You can call it sensitive, I'm not sure how you

17  can preclude the defense from inquiring as to another

18  motive, if you will, of this altercation.

19           MR. MIZRAHI:  Again, you can continue with the

20  line of questioning I'm just going to ask you to tread very

21  carefully here.

22           THE COURT:  I'm the one doing the asking,

23  Mr. Mizrahi.

24           Mr. Siegler, ask your questions.

25           MR. SIEGLER:  Thank you.

1    EXAMINATION BY

2    MR. SIEGLER:

3    (Continuing.)

4    Q    Who is Sasha Pena?

5    A    My son's mother.

6    Q    Are you still romantically involved with Ms. Pena?

7    A    No.

8    Q    When did you stop being romantically involved with

9    Ms. Pena?

10   A    My son is two.

11   Q    Can you give us a year?

12   A    My son is eight, six years ago.

13   Q    So you have no romantic involvement with Ms. Pena at

14   all at this point?

15   A    No.

16   Q    Were you aware of whether Alex Briceno had an intimate

17   relationship with Ms. Pena?

18   A    No.

19   Q    This is the first time you're hearing of it?

20   A    Yes.

21   Q    You said you mentioned your sister.  Is that Yesenia?

22   A    Yes.

23   Q    She's the one who went down to pick up your laundry?

24   A    Correct.

25   Q    Do you recall whether Yesenia and Jeissy were good

C. Martell - Cross/Mr. Siegler                66

1   friends?

2   A    They were.

3   Q    Did they go to high school together?

4   A    I don't know.

5   Q    How far is the Northern -- I'm sorry -- the

6   Turbo Limited Laundromat from your house?

7   A    About one exit.

8   Q    So how long to drive?

9   A    Three minutes on the highway.

10  Q    How much door to door?

11  A    Huh?

12  Q    How long did you drive that night to get to the

13  Turbo Limited?

14  A    About three minutes.  It's on the highway, it's one

15  exit away.

16  Q    Is that your normal place to do laundry?

17  A    Correct.

18  Q    You normally do laundry on a Thursday?

19  A    Yes, Thursday nights.

20  Q    Do you live alone or with your son?

21  A    Alone.

22  Q    Was the laundromat crowded at 8:30 p.m. on a Thursday?

23  A    No.

24  Q    Do you know what Jeissy Briceno looks like?

25  A    Yes.

C. Martell - Cross/Mr. Siegler                    67

1   Q     How do you know what she looks like?

2   A     I used to work for her.

3   Q     What was the reason you lost your job in January 2020?

4   A     I got sick.

5   Q     Did you get fired?

6   A     Yes.

7   Q     Who fired you?

8   A     Jeissy.

9   Q     When did --

10        MR. SIEGLER:  Let's go back on the sealed for a

11   moment.  Can we do that, your Honor?  I'm going to ask him

12   about these conversations with the two plaintiffs.

13        THE COURT:  All right.  So why don't we seal this

14   portion.

15   EXAMINATION BY

16   MR. SIEGLER:

17   (Continuing.)

18   Q     When did -- let me ask you this.

19        Has Wladimir Briceno ever communicated with

20   you since the lawsuit began?

21   A     No.

22   Q     Has Betty Briceno ever -- has Betty Briceno

23   communicated with you in any way since the lawsuit began?

24   A     No.

25   Q     Has Jeimy Briceno communicated with you at any time

C. Martell - Cross/Mr. Siegler                    68

1   since the lawsuit began?

2   A    No.

3   Q    And other than December 2nd, has Jeissy Briceno

4   communicated with you at any time?

5   A    No.

6   Q    And you are, in fact, here illegally?

7   A    Am I here what?

8         THE COURT:  Sustained.

9         MR. SIEGLER:  Okay.

10        THE COURT:  Sustained.

11  Q    What did ▮▮▮▮ say to you when he called you about

12  possible threats?

13  A    That he was called by Alex and said that if he doesn't

14  take his name off that they're going to file other charges

15  and ICE, basically.

16  Q    What time of day was the phone call?

17  A    I don't know.

18  Q    What time of the day was your phone call with ▮▮▮▮?

19  A    I don't remember.

20  Q    What day was it?

21  A    I don't remember the day.

22  Q    Was it dark or light?

23  A    Daytime.

24  Q    Is ▮▮▮▮ someone you communicate with regularly?

25  A    Just because of the lawsuit.

C. Martell - Cross/Mr. Siegler                69

1  Q    How did ████ here hear of the lawsuit?

2          MR. MIZRAHI:  Objection, your Honor.

3          THE COURT:  Sustained to the extent that you're

4  looking for attorney-client information.  He's the named

5  plaintiff.

6          MR. MIZRAHI:  Exactly, your Honor, yes.

7          MR. SIEGLER:  I'm looking for communications

8  between this witness and ████.

9          THE COURT:  I think your question was:  How did

10  ████ know about the lawsuit?  Did I mishear you?

11          MR. SIEGLER:  I might have asked it --

12          THE COURT:  Incorrectly.

13          MR. SIEGLER:  Thank you.

14  EXAMINATION BY

15  MR. SIEGLER:

16  (Continuing.)

17  Q    Did you advise ████ about the lawsuit?

18  A    Correct.

19          THE COURT:  I'm sorry.  Could you clarify what you

20  meet by advise him about the lawsuit.  Please elaborate.

21          MR. MIZRAHI:  Your Honor, I'm going to once again

22  just ask my client Carlos, to the extent they're asking you

23  any questions that requires you to divulge any

24  communications between you and me and anyone else, I'm going

25  to ask that you not divulge those communications.  So please

C. Martell - Cross/Mr. Siegler          70

1   only answer the questions to the extent that they don't

2   require you to divulge any conversations that you and I have

3   had, or that I have had with any of your fellow plaintiffs.

4           THE COURT:  The easier way to think about it is if

5   you are and ███ are talking directly, you can tell me.  If

6   you're talking with ███ with your lawyer, or through your

7   lawyer, you don't have to testify about that.

8           THE WITNESS:  Okay.

9           THE COURT:  So did you and ███ have a

10  conversation just by yourselves or without your lawyer about

11  the lawsuit?

12          THE WITNESS:  When I went to go in for the

13  lawsuit.

14          THE COURT:  Okay.  So when you went in to try to

15  file a lawsuit.

16          THE WITNESS:  Correct.

17          THE COURT:  Did you talk to ███ before that?

18          THE WITNESS:  No, after that.

19          THE COURT:  He wasn't with you at the meeting; is

20  that right?

21          THE WITNESS:  No.

22          THE COURT:  Okay.  Go ahead.  What did you tell

23  ███?

24          THE WITNESS:  Oh, that I'm doing a lawsuit because

25  of the -- we weren't paid overtime.

```
              C. Martell - Cross/Mr. Siegler            71
```

1              THE COURT:  Okay.

2              THE WITNESS:  And since he worked with us, if he

3     wanted to put his name down for that because that's what the

4     lawsuit is about.

5              THE COURT:  Go ahead, Mr. Siegler.

6     EXAMINATION BY

7     MR. SIEGLER:

8     (Continuing.)

9     Q    What, if anything, did you say to ███ after he told

10    you that Alex said they would file charges on him?

11    A    That I would speak to the lawyer for him.

12             THE COURT:  Can I ask you a question?  Was ███ a

13    plaintiff at the time he got the call from Alex?

14             THE WITNESS:  Correct.

15             THE COURT:  Okay.

16    Q    When did you get the call from ███?

17    A    I don't remember.

18    Q    Was it after the lawsuit was filed?

19    A    Correct.

20    Q    Did you tell ███ about the lawsuit out of the

21    presence of your attorney?

22    A    Correct.

23    Q    What did ███ tell you?

24    A    That they threatened him with immigration.

25    Q    Who is they?

1    A    Alex.

2    Q    Did ▮▮▮▮ say that Wladimir threatened him with

3    deportation?

4    A    I don't know.  I don't know whether he speak to him or

5    not.

6    Q    He told you only Alex only?

7    A    Yes.

8    Q    So he didn't tell you Betty?

9    A    No.

10   Q    He didn't tell you Jeissy?

11   A    No.

12   Q    He didn't tell you Jeimy?

13   A    No.

14   Q    Same thing for ▮▮▮▮.  Did ▮▮▮▮ mention anything about

15   any of the other Bricenos other than Alex?

16   A    No, because of the lawsuit.

17   Q    Okay.  You testified to the Court in your December 6th

18   affidavit which I could show you that defendants threatened

19   certain plaintiffs to go to the INS.  And then on

20   December 9th, you clarified and said Alex.  Which one is

21   true?

22         MR. MIZRAHI:  Objection to the extent that

23   question misconstrues the affidavit.  I think the affidavit

24   would speak for itself.  I don't think the client has to in

25   front of him.

1        THE COURT:  Why don't you hand it up to him?

2        MR. MIZRAHI:  I don't think that's what the

3    affidavit says.

4        THE COURT:  He can be cross-examined about his own

5    affidavits.

6        MR. MIZRAHI:  That's fine.

7        THE COURT:  And what he meant.  And to the extent

8    that's it's contradictory, he should explain the

9    contradiction.

10       (A brief pause in the proceedings was held.)

11   EXAMINATION BY

12   MR. SIEGLER:

13   (Continuing.)

14   Q    Mr. Martell, I'm going to show you an affidavit and ask

15   you if you recognize that document?

16   A    Correct.

17   Q    And flip to the last page.

18       THE COURT:  Can you state for the record what

19   you're showing him.

20       MR. SIEGLER:  Yes, affidavit of Carlos Martell.

21   It's Document 44-1 on PACER.

22   Q    And is that your signature at the end?

23   A    Correct.

24   Q    Okay.  I'm going to draw your attention --

25       MR. MIZRAHI:  Can I have a copy of that -- can I

C. Martell - Cross/Mr. Siegler                74

1    ask to see a copy of that, please.

2            THE COURT:  You can show it.

3            MR. SIEGLER:  This is my own copy.

4            THE COURT:  Show it to him.  You presumably have a

5    copy.

6            What's the date of that declaration?

7            MR. SIEGLER:  It's December 5th.

8            THE COURT:  Okay.  Thank you.

9            MR. MIZRAHI:  Thank you.

10           MR. SIEGLER:  Thank you.

11   EXAMINATION BY

12   MR. SIEGLER:

13   (Continuing.)

14   Q    Okay.  I call your attention to Paragraph 6, and would

15   you mind reading that to the Court, please?

16   A    Shortly after, they became aware of plaintiff's lawsuit

17   the defendants threatened and are continuing to report

18   certain plaintiffs to the United States Immigration and

19   Naturalization Services, INS.

20   Q    Thank you.  Mr. Martell, I'm going to show you another

21   document.  It's Document 49 on PACER.  It's an affidavit of

22   Carlos Martell signed and notarized on December 8th.

23           Do you recognize that document?

24   A    Correct.

25   Q    Is that your signature at the end?

1   A    Correct.

2   Q    Okay.  Could you read Paragraph 7 to the Court, please?

3   A    At the center of this intimidating campaign is Alex

4   Briceno, three.  Who has threatened and continued to

5   threaten to report certain plaintiffs to the INS.

6   Q    Three is a footnote.  Could you read the footnote?

7   A    Alex Briceno is Wladimir and Betty Briceno's son and

8   Jeissy and Jeimy Briceno brother.

9   Q    Thank you.  So in order to obtain the Temporary

10  Restraining Order, sir, you allege that defendants, all of

11  them, have threatened to report certain other plaintiffs to

12  INS but after the Temporary Restraining Order was entered

13  now it's just Alex?

14           MR. MIZRAHI:  Objection to the form of that

15  question.

16           MR. SIEGLER:  I'm not even finished with the

17  question.

18           MR. MIZRAHI:  You can continue.

19           THE COURT:  Mr. Mizrahi, I decide who gets to

20  continue or not and I'm going to overrule the objection.

21           Go ahead.

22  Q    Mr. Martell, can you explain the difference why first

23  you said defendants and then you just said just Alex?

24           THE COURT:  Yes, you may comment or respond,

25  rather.

C. Martell - Cross/Mr. Siegler                76

1  A    Defendants, I said, because it's a whole their family

2  has -- it's against the family, the lawsuit.  But he's the

3  one that called his own.

4  Q    Do you have any evidence that Alex is doing these

5  things at the request of Wladimir?

6  A    For me?  Like when I was attacked, there's text

7  messages showing that she called him to come and see me

8  basically on the text.

9  Q    Did Wladimir ask Alex to assault you?

10 A    I don't know.

11 Q    You don't know?

12 A    No.

13 Q    Did Betty Briceno the mom ask Alex to assault you?

14 A    I don't know.

15 Q    Did Jeimy the sister ask Alex to assault you?

16 A    I don't know.

17 Q    Did Jeissy ask Alex to assault you?

18 A    She text him to come to the laundromat insinuating

19 something.

20 Q    Do you know why she texted that?

21 A    No.

22 Q    Okay.

23         MR. SIEGLER:  No further questions.

24         THE COURT:  All right.  Thank you.  Did you want

25 to ask any redirect, Mr. Mizrahi?

C. Martell - Cross/Mr. Siegler                77

1              MR. MIZRAHI:  No.

2              THE COURT:  Have a seat.  Thank you very much,

3      Mr. Martell.

4              I do have one question for you, Mr. Mizrahi,

5      relating to the photograph that Mr. Martell took of his

6      alleged injuries.

7              Do you have anything that would provide or

8      substantiate when that photo was taken?  Metadata or

9      anything like that?

10             MR. MIZRAHI:  I do, your Honor.

11             THE COURT:  Okay.  What do you have?

12             MR. MIZRAHI:  After Carlos Martell's assault, I

13     asked him whether he had taken any photographs or videos of

14     his injuries.  That conversation, I believe, took place the

15     day after the attack.

16             THE COURT:  So December 3rd?

17             MR. MIZRAHI:  So I had communicated with my client

18     on December 3rd and I asked him, Carlos, did you photograph

19     yourself after the attack?  He said, yes, I did.  I asked

20     him if he could provide me with any copies of photos or

21     videos that he taken to document his injuries.  In response,

22     he had provided me with a video that he had taken of himself

23     documenting his injuries.  I have a copy of that video on my

24     phone.  I could provide it to the Court now.  That video

25     should have metadata, time-stamped metadata, corroborating

Proceedings                                    78

1   when it was taken.

2          THE COURT:  Okay.  That sounds fine because even

3   though the plaintiff, Mr. Martell, may have provided that

4   video to you a day after the assault, obviously, the photo

5   or video could have been taken long before then and in

6   connection with some other incident.  But if, in fact, the

7   original has a date or timestamp on it that would be useful.

8   I don't know if that's ordinarily true I'm just thinking

9   about my own experience with photos or videos on iPhone.  It

10  certainly indicates the length of it, but it doesn't even

11  tell you when it was taken unless you program it that way, I

12  suspect.

13         MR. MIZRAHI:  Your Honor, we have that documentary

14  evidence.  We can provide it to the Court.

15         THE COURT:  Okay.  So you have -- okay.  Pardon my

16  ignorance, I'm not sure what it is you have but if you have

17  that yes, I would like to see that as well.

18         Mr. Martell can you retake the stand for one

19  moment.  I'm so sorry.  I'll remind you that you are still

20  under oath.

21         (Witness takes the witness stand.)

22  **CARLOS MARTELL**, called as a witness, having been previously

23  duly sworn, was examined and testified as follows:

24         THE COURT:  Please have a seat so you are still

25  under oath, remember that.

Proceedings                              79

1          You mentioned that you were terminated from your

2     employment by W.B., right?

3                THE WITNESS:  Yes.

4                THE COURT:  And you said it was because you were

5     sick.

6                THE WITNESS:  Correct.

7                THE COURT:  What did you mean by sick?

8                THE WITNESS:  Do you want me to tell you.  On

9     Friday we collect our paychecks on Friday.

10               THE COURT:  Yes.

11               THE WITNESS:  Friday we got text messages on

12    Friday.  I told her that I was sick.  That was before

13    Corona.  So January we didn't anything about that.

14               THE COURT:  January 2020.

15               THE WITNESS:  I had a fever.  So when I picked up

16    my check, I told her I was sick.  I told her, I'll tell you

17    how I feel throughout the weekend to see how I feel on

18    Monday.  Saturday, I text her, also.  I told her I'm not

19    feeling too well, let's see how I feel tomorrow, Sunday.  I

20    text her saying I'm not feeling well.  I woke up on Monday

21    around 5:00 in the morning because we have to be at work at

22    7:00.  I text her at 5:00 in the morning letting her know

23    I'm still sick, I'm going to take some NyQuil so I could

24    sleep to off more.  I woke up at 11:00 o'clock,

25    12:00 o'clock on a Monday and she says just take the whole

Proceedings                                          80

1  week off.  And then that's it.  I told her thank you for
2  everything and that's it.
3            THE COURT:  I'm sorry.  Why did you view yourself
4  as having been fired then, or do you view yourself as having
5  been fired?
6            THE WITNESS:  Of course.  I asked her in the
7  messages.  I don't get it why I'm being penalized?
8  Basically, you're being punished for coming to work, I gave
9  you the week off.
10            THE COURT:  But if all she said was take the week
11  off, why did you view that as being fired?
12            THE WITNESS:  When they don't give you work,
13  basically, they don't want you there.  That's how the
14  company really works.  They don't give you a letter saying
15  you're terminated or nothing like that.  They don't give you
16  work.  That's the way they don't want you there anymore.
17            THE COURT:  Right.  But she simply said to you
18  take the week off.
19            THE WITNESS:  Yes.
20            THE COURT:  Did you believe that you could come
21  back and work for them?
22            THE WITNESS:  No.
23            THE COURT:  After the week?
24            THE WITNESS:  No.
25            THE COURT:  So --

Proceedings                              81

1          THE WITNESS:  This happens a lot.  When they tell

2    you, we don't have no work for you, just take a day off,

3    they don't want you to be there.

4          THE COURT:  Did you feel that your termination was

5    unfair?

6          THE WITNESS:  Yes.

7          THE COURT:  And do you hold Jeissy Briceno as

8    responsible for your firing?

9          THE WITNESS:  Correct, yes, she is the boss.

10         THE COURT:  Do you feel resentful at all towards

11   her for having fired you?

12         THE WITNESS:  No, it's business, I guess.  But,

13   no, not resentful.

14         THE COURT:  Even though you think it was unfair?

15         THE WITNESS:  Very unfair.

16         THE COURT:  Did you view yourself as a good worker

17   before then?

18         THE WITNESS:  Correct.  I was one of the

19   supervisors there.

20         THE COURT:  Did you have any issues before about

21   showing up or being sick?

22         THE WITNESS:  No, nothing.  It was that that we

23   didn't know Corona.  We didn't know what it was.  So I had a

24   regular fever, a regular flu, basically, from Friday,

25   Saturday, Sunday, and Monday.

Proceedings                    82

1          THE COURT:  Why are you connecting it to Corona

2   since, as you know --

3          THE WITNESS:  I guess, I'm guessing that you knew

4   about Corona and things like that that you would give leeway

5   because of that because you understood more.

6          THE COURT:  Oh, I see.

7          THE WITNESS:  That's why.

8          THE COURT:  How long did it take to you find work

9   after you were terminated by W.B.?

10          THE WITNESS:  The next week.

11          THE COURT:  And where did you start working then?

12          THE WITNESS:  It was called, it was a marble place

13   a tile and marble place in the warehouse.

14          THE COURT:  How long did you work for them?

15          THE WITNESS:  I worked for a month and then I got

16   a better job in construction.

17          THE COURT:  Okay.  And how long did you work for

18   that next company?

19          THE WITNESS:  Still working.

20          THE COURT:  Okay.  Even though there was a

21   pandemic?

22          THE WITNESS:  Yes.  We worked through the

23   pandemic.

24          THE COURT:  Okay.  Did anyone want to ask any

25   other questions based on what I just asked Mr. Martell?

Proceedings                                      83

1          MR. MIZRAHI:  None from plaintiffs.

2          MR. SIEGLER:  No.

3          THE COURT:  All right.  You may step down.  Thank

4    you again.

5          (Witness leaves the witness stand.)

6          THE COURT:  Let me ask you a question,

7    Mr. Mizrahi.

8          Tell me all of the evidence that you want me to

9    consider with respect to the involvement of the parents who

10   are defendants, Wladimir Briceno and Betty Briceno.  And I

11   say involvement in the alleged harassment and intimidation.

12         MR. MIZRAHI:  Your Honor, we ask the Court to

13   consider the fact that Wladimir, Betty, and their daughters

14   have been named as individual defendants in the underlying

15   complaint filed in September 2021.

16         We ask the Court to consider the fact that

17   typically before formal service is effectuated, it is not

18   unusual for individual defendants to receive solicitations

19   through the mail from attorneys or through other

20   third-parties informing them of the filing of a complaint.

21   Typically, these solicitations are done the same day in

22   order to obtain engagements from potential clients.

23         THE COURT:  Well, I certainly accept the fact that

24   the parents know about the lawsuit.  The question is:  What

25   evidence, if any, do you have that they somehow instigated

Proceedings                                        84

1    or approved of or aided this campaign of intimidation and

2    harassment?

3           MR. MIZRAHI:  We further ask the Court to consider

4    the testimony that is presented today by Mr. Martell that

5    Alex had worked alongside his father; that the Bricenos had

6    both worked, that both Alex and Wladimir worked alongside

7    each other; that they had shared the same employees.

8           We ask the Court to consider the fact that very

9    shortly after the filing of this complaint against Wladimir

10   and Betty, Alex had started targeting certain individually

11   named plaintiffs.

12          Your Honor, the, you know, defense counsel had

13   stated that Wladimir and Betty are in their-Beth in their

14   70s, I'm not disputing that.  And it's, you know, of course,

15   you know, why would they pick up the phone themselves, these

16   two elderly people, when they could get other people to do

17   it for them.  And, in this case, they had Alex, they had

18   Jeissy, they had Jeimy.

19          THE COURT:  Let me ask you a question about Jeimy

20   what evidence do you have that she was involved in any of

21   these alleged threats to report people to INS or this

22   assault that happened on December 2nd?

23          MR. MIZRAHI:  We're using the defendants as a

24   plural to kind of show that we know that there was a phone

25   call placed by Alex.  We know that all the Bricenos were

Proceedings                                                     85

1   named as individual defendants.  Alex wasn't named as an

2   individual defendant at that time but for some reason he

3   knew of it.  So he would only know of it had he obtained

4   information from one or all of the individual defendants.

5   We don't have text messages, we don't e-mails, and I'm sure

6   we may get some of that information during discovery.  But I

7   think the circumstantial evidence given the temporal

8   proximity and given the, you know, the intimate

9   relationship, familial relationship, between the parties at

10  issue.  I think it's not, you know, unfair to say, yeah, I

11  think they're working together here.

12          THE COURT:  Okay.  All right.

13          Do you want to make any additional argument that

14  you haven't already in your written submissions regarding

15  the preliminary injunction you seek?

16          MR. MIZRAHI:  We rest on our filings.  We rest on

17  the testimony that was provided by Mr. Martell to the Court

18  here today.  We don't want to, you know, there's nothing

19  further that we feel like we need to add, your Honor.

20          THE COURT:  Mr. Siegler, and actually, before I

21  hear from you Mr. Siegler, let me note for the record that I

22  failed to unseal the transcript.  So we'll unseal that after

23  Mr. Mizrahi's testimony in which he talks about the two

24  named plaintiffs, or one named plaintiff and one opt-in

25  plaintiff, just so the parties know.

Proceedings                                    86

1          Is there any objection to unsealing the rest of

2     the transcript after the reference specifically,

3     specifically, to those individuals?

4          MR. SIEGLER:  Not from plaintiffs, your Honor.

5          THE COURT:  All right.  So, Mr. Siegler, I'll hear

6     from you on the preliminary injunction.  Let me just say

7     this:  I do credit Mr. Martell's testimony.  And, for me,

8     the question is what type of injunction to impose and

9     everyone is aware of the factors.  So I'm giving you the

10    benefit of my thoughts on this, Mr. Siegler, so you can

11    respond.

12         With respect to the likelihood of success on the

13    merits or sufficiently serious questions, I do think that

14    the plaintiffs have met their burden at least with respect

15    to a current defendant, Jeissy Briceno, and also the new

16    defendant in the amended complaint, Alex Briceno, with

17    regard to claims of retaliation and assault and battery

18    which is obviously a state law claim.  I find that the

19    evidence is credible.

20         Mr. Martell was credible in his description of the

21    event isn't contradicted by the defendants offering of an

22    affidavit, and apparently, not really contradicted by this

23    video that wasn't produced but should have been.  So I do

24    think that there's at least sufficiently serious questions

25    going to the merits.

Proceedings                    87

1        Now, I see there's a procedural issue here, and

2   so, I will allow the plaintiffs to amend as a proposed --

3   the complaint to add Mr. Briceno and these additional

4   claims.  And I understand that there might be some

5   additional claims from some of the plaintiffs who are now

6   going to be added; is that correct?  New plaintiffs, I

7   should say.

8            MR. MIZRAHI:  Yes, Your Honor.

9            THE COURT:  Okay.  With respect to irreparable

10  injury, I find that there would be an irreparable injury if

11  the plaintiffs are prevented or intimidated into not

12  pursuing their lawsuit.  There is obviously an intangible

13  harm here.  An intangible one.  I reference the intangible

14  one because question is, is it a harm that can be

15  compensated.  And the intangible harm is preventing access

16  to the justice system which isn't compensable if the lawsuit

17  is not actually pursued.  The balance of hardships I find

18  decidedly tips in plaintiffs' favor.  I don't feel that the

19  defendants are going to be harmed at all by simply being as

20  the defense acknowledges told to obey the law and not to

21  make false complaints to ICE or to -- or for some ulterior

22  purpose report someone to ICE, or to refrain from assaulting

23  someone which is obviously against the law.

24        So I don't feel that the defendants will be harmed

25  by an injunction that tells them not to violate the law

Proceedings                                           88

1   during the pendency of this case.  The speculative harm

2   about plaintiffs bringing false claims to support contempt

3   motions is simply that, it's sheer speculation and obviously

4   ignores the fact that any contempt motion would have to be

5   based on facts that I find are established and will be

6   tested through the process that we have here.  So the

7   possibility of someone falsely moving for contempt is not an

8   actual harm to defendants.

9           And then, lastly, I find that the public interest

10  would certainly be served and would not be disserved by the

11  issuance of a preliminary injunction under these

12  circumstances.  No litigant should ever be intimidated or

13  caused to fear retribution for bringing a lawsuit that they

14  feel is meritorious.

15          So I do find that this assault happened as

16  described my Mr. Martell.  I do credit the reports about

17  Mr. Alex Briceno at least calling two of the potential

18  plaintiffs.  One a named plaintiff and the other one an

19  opt-in plaintiff and threatening them with reporting to

20  immigration authorities, an especially potent threat in a

21  case such as this.

22          So, therefore, I do want to issue an injunction as

23  well as allow plaintiff to amend their complaint.  The only

24  issue really, Mr. Siegler, that I'd like you to address is

25  to whom will this injunction apply.  And, quite frankly, my

Proceedings                                      89

1    inclination is only to apply it to Jeissy Briceno and also

2    Alex Briceno once he's added to the case.

3           And, as I said before, you're right, I think he

4    has a light to revisit this issue once he's served and he's

5    represented by someone.  So I think there's a legitimate

6    question about whether or not I can issue the preliminary

7    injunction about a defendant who has not yet been served

8    with the complaint so it may actually be meaningless.  But,

9    certainly, once the complaint is filed, Mr. Alex Briceno

10   will be notified that he's also enjoined at this time from

11   making any threats or carrying out any assaults against

12   anyone to intimidate or retaliate against them in connection

13   with the lawsuit.

14          So, Mr. Siegler, I did say I would let you be

15   heard.

16          MR. SIEGLER:  Thank you, Judge.

17          I did obviously hear your ruling.  I agree that if

18   there's an injunction to be entered, it should be against

19   Alex who is not here and perhaps Jeissy.  If your Honor is

20   inclined, you know, I can certainly see your reasoning for

21   that.  I would ask that any injunction be required to be

22   served on Alex within a certain period of time so we can

23   avoid this issue where he's in limbo, things are being

24   ordered against him, and he really has no notice of it.

25          So if we could add that, you know, within seven

Proceedings                                          90

1   days or something.  My clients will be served, obviously,

2   because they're represented.  And, I mean, your Honor made a

3   ruling.  I tend to disagree about the INS threat, one of

4   which was made allegedly by a nonplaintiff at the time which

5   strikes me as odd.  But, you know, it's not really

6   my -- it's really not my witness it's Mr. Briceno can

7   address that at the appropriate time.  And you're granting

8   him leave I guess at any time to dissolve the injunction

9   upon his motion.

10          THE COURT:  Or at least to contest it, which could

11  have an impact on your client as well.  But just so the

12  record is clear, I have credited what Mr. Martell reported

13  about the assault incident which is the only incident in

14  which Jeissy Briceno is directly implicated.  And I do

15  credit Mr. Martell's reporting about him being assaulted

16  without any warning or notice and without any provocation by

17  him and with Jeissy Briceno recording it which you've

18  confirmed, and then also making comments about taking her

19  money which you also confirmed in the context of Mr. Alex

20  Briceno and Ms. Jeissy Briceno trying to send a message

21  about people who file lawsuits against them.

22          Perhaps there's some other motivation, although

23  that wasn't really borne out by any of the testimony of

24  Mr. Martell including cross-examination.  I didn't sense,

25  actually, that he was being untruthful about any prior

Proceedings                                          91

1    interactions with Mr. Alex Briceno over the mother of

2    Mr. Martell's children or even a longstanding resentment

3    against Jeissy Briceno for firing him under circumstances he

4    said seemed unfair.  It sounds like Mr. Martell was able to

5    get back to work pretty quickly for one, and then another

6    company.  Perhaps that mitigates any ill will he has against

7    Jeissy Briceno for firing him.  Like I said, based on my

8    observation of Mr. Martell, I do credit his testimony and

9    his account of what's happened and that does to me implicate

10   Ms. Jeissy Briceno and Mr. Alex Briceno in this campaign, or

11   at least in some efforts.  Maybe campaign is overstating it.

12   But at least in two or three incidents of trying to

13   intimidate or retaliate against the plaintiffs who brought

14   this lawsuit, and that's something that has to be shut down.

15         The message, obviously, should be sent to your

16   other clients that this injunction, while only applying

17   right now to two of the defendants assuming that the

18   complaint is amended, there should be nothing of this sort

19   happening between now and when this case gets resolved or

20   else, obviously, it will be met with a swift injunction, if

21   not a contempt motion that could be very costly if not

22   otherwise punitive against the defendants.

23         MR. SIEGLER:  Understood, your Honor.

24         THE COURT:  Honestly, I think the filing of the

25   motion in itself should have some kind of prophylactic

Proceedings                                    92

1   effect.

2               MR. SIEGLER:  Yes.

3               THE COURT:  Or should persuade anyone who is

4   thinking of doing this not to do so.

5               MR. SIEGLER:  Can I make a comment about the

6   motion to amend?

7               THE COURT:  Yes.

8               MR. SIEGLER:  They want to add this company called

9   W.B. & Son Construction is no longer --

10              THE COURT:  A viable entity?

11              MR. SIEGLER:  Yes, it was dissolved in 2016.  And

12  Alex and his dad split up.  This was a family business, they

13  ended in 2014 and then it took a while for the corporation

14  do dissolve.  I guess they failed to file returns and

15  things.  That is well before the period of the FLSA period

16  and even the New York period because Jeissy said without

17  contest that, you know, they weren't doing anything in 2015

18  either.  None of the plaintiffs worked, apparently, for the

19  construction company.  They worked for this other entity

20  called W.B. Maintenance and Repair, not maintenance and

21  design.

22              So I know why plaintiffs' counsel included this

23  entity because he wants to get Alex Briceno as an employer.

24  But I want to flag this issue because there maybe a motion

25  to dismiss this particular entity because it didn't employ

Proceedings                                    93

1    any of these plaintiffs.

2           THE COURT:  I thought it employed Mr. Martell.

3           MR. SIEGLER:  He testified it did.  He testified

4    it is one company.  It was called construction.  There's

5    actually different entities.

6           THE COURT:  Go ahead, Mr. Mizrahi.

7           MR. MIZRAHI:  Two or three responses.

8           Number one, I think that there is, you know, a

9    difference between a d/b/a and a legal entity.  Number two,

10   the entity at issue W.B. & Son Construction Corp. was

11   included in the underlying complaint filed in

12   September 2021, it was not a newly added defendant.  And an

13   answer to the client was actually already filed by prior

14   counsel Stephen Hans.  Not raising any issue with the

15   employer liability of this entity.

16          THE COURT:  Well, I do see that

17   W.B. & Son Construction Corp. is already a defendant in this

18   case.

19          So are you referring to that entity, Mr. Siegler?

20          MR. SIEGLER:  Yes, that's the entity that was

21   dissolved.  I'm not sure why prior counsel didn't address

22   that.  We're certainly not barred.  We can bring that motion

23   at any time, I think.  But it may help narrow the case and

24   these FLSA cases and joint enterprise cases are very complex

25   and all really they need is one plaintiff to say I work for

Proceedings                                          94

1    both.  I guess it will shake out in discovery then.

2           THE COURT:  Let's see what happened.  You can

3    move, but first, you have to file a premotion conference

4    letter explaining why it is you want to dismiss the

5    W.B. & Son entity but we can address that then.  And even if

6    the parties can talk and decide that they want to jointly

7    amend or the plaintiff wants to amend the complaint based on

8    some agreement, that's fine.  But for now I'm going to

9    address the two motions before me.  The one for the

10   preliminary injunction and the motion simply to allow the

11   amended complaint to be filed.

12           Did you want to say anything else, Mr. Mizrahi?

13          MR. MIZRAHI:  It was an originally pled defendant

14   in this case.  The last thing I want to say is that, you

15   know, we presented a meaningful argument with respect to

16   employer liability for Alexander Briceno given the

17   admissions in the affidavit that he was a co-owner of the

18   entity, and in light argument that he we had raised with

19   respect to the single integrated enterprise.

20           That being said, you know, there are

21   representations in defendant's motions that we are worried

22   about judicial efficiency and we don't want to waste any

23   resources.  And then there's money that we should be worried

24   about conserving here, you know, the threatened motion to

25   dismiss or at least a contemplated motion to dismiss I think

Proceedings                                     95

1    just runs opposite those representations.

2            So I'd like to move forward with this case.  I

3    think that this should have been, should have and is a

4    straightforward FLSA case.  I'd like to get to the bottom of

5    this.  And, you know, I think that -- I think that's it,

6    your Honor.

7            THE COURT:  It may well be, Mr. Siegler, for the

8    reasons you're saying namely that FLSA and joint enterprise

9    issues are complicated and often factually based or

10   determined.  It may be that the better course is for you to

11   file summary judgment at some point after discovery is taken

12   and you can effectively argue that the entities are separate

13   or whatever your argument is and that W.B. Construction

14   didn't employ, or wasn't the employer, for these plaintiffs.

15           The fact that it dissolved obviously is something

16   that seems to be undisputed.  I just don't know whether or

17   how that effects all the claims for the various plaintiffs.

18   I don't know if that eliminates everyone's claims because

19   2016 is only five years ago, right?

20           MR. SIEGLER:  That's why I said 2015 would take it

21   within the six-year -- but I think what's going to come out

22   is that it's a family with numerous businesses, some of

23   which involved Alex and some of which involved.

24           THE COURT:  Involved who?

25           MR. SIEGLER:  Some of which involved Alex and some

Proceedings                                96

1    of which didn't.

2         THE COURT:  I do think, and I am a fan of

3    efficiency, so if that issue or the appropriateness of

4    having W.B. & Son in this case is one that can be rolled in

5    to various other issues perhaps in summary judgment

6    especially because an answer was already provided for that

7    defendant without raising a motion to dismiss, I think

8    that's the more efficient course.  But, at this moment, to

9    the extent you're speaking about Alex Briceno, he's not your

10   client; and so, we'll have to see what his lawyer says when

11   he is served with the amended complaint.

12        So the rulings are as follows.

13        The amended complaint can be filed and it should

14   be served as required by the rule.  I also direct plaintiffs

15   to file their preliminary injunction motion, the more recent

16   filings or papers that gave rise to this hearing.  And then,

17   there's going to be a docket order about the preliminary

18   injunction.  But also to note you should send him a copy of

19   the docket order or minute entry that summarizes the fact

20   that I'm issuing a preliminary injunction enjoining Alex

21   Briceno and Jeissy Briceno from -- and I should formally

22   word it -- did you have a proposed order?

23        MR. MIZRAHI:  I did, your Honor.  It was attached,

24   I believe, as Exhibit C to the Mizrahi declaration.  We ask

25   that the Court consider the additional language covering

1  both of these named individuals directly and indirectly.

2  There's language in the proposed the order that, you know,

3  reflects that they cannot act through any third-parties.

4          THE COURT:  Yes.  Probably what I'll do is, just

5  so there is no ambiguities, I will issue a formal order.

6          Have you provided a copy of your proposed order to

7  us in Word via --

8          MR. MIZRAHI:  There's an e-mail to your chambers

9  pursuant to your Honor's individual rules.

10         THE COURT:  Good.  All right.  So I will issue

11 something to effect.  The gist of that will be those two

12 defendants and their agents or, I guess, agents or

13 employees, et cetera are barred from intimidating,

14 harassing, or retaliating against any plaintiff in

15 connection with the lawsuit.

16         So the language will be fine tuned a bit, but that

17 will be the gist of it and that should be served also on

18 Mr. Alex Briceno when he gets a copy of amended complaint.

19         Is there anything else we need to address from

20 you, Mr. Mizrahi?

21         MR. MIZRAHI:  Nothing further, your Honor.  I

22 thank the Court for its time.

23         THE COURT:  Mr. Siegler.

24         MR. SIEGLER:  No, Your Honor.

25         THE COURT:  Thank you everyone and have a good

Proceedings                                             98

1   holiday.

2          MR. SIEGLER:  You, too.

3          THE COURT:  Stay safe.

4          (WHEREUPON, this matter was adjourned.)

5

6                        *   *   *

7

8          <u>CERTIFICATE OF REPORTER</u>

9

10  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-entitled matter.

11

12

13

14

15  _____
    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
16  Official Court Reporter

17

18

19

20

21

22

23

24

25

99

<u>INDEX</u>

<u>WITNESS:</u>                                    <u>PAGE</u>:

CARLOS MARTELL

        DIRECT EXAMINATION

        BY MR. MIZRAHI.........................    30

        EXAMINATION BY THE COURT.................   41

        DIRECT EXAMINATION

        BY MR. MIZRAHI.........................    59

        CROSS-EXAMINATION

        BY MR. SIEGLER.........................    60

        EXAMINATION BY THE COURT.................   70

CARLOS MARTELL

        EXAMINATION BY THE COURT.................   78

* * * * *

100

## INDEX OF EXHIBITS

FOR THE PLAINTIFF:                                    PAGE:

Plaintiff's Exhibit A was received in evidence as
of this date......................................   37
Plaintiff's Exhibit B was received in evidence as
of this date......................................   40

\* \* \* \* \*